IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Adrienne W. Saulsberry, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No. _____ |
| | ) | |
| Savannah River Remediation, LLC, | ) | Complaint |
| | ) | Jury Trial Requested |
| Defendant. | ) | Injunctive Relief |
| _____) | | Damages |

## COMPLAINT

Plaintiff Adrienne W. Saulsberry ("Plaintiff" or "Mrs. Saulsberry") files this her

Complaint showing this Honorable Court the following:

## PARTIES

1.      The Plaintiff, Mrs. Saulsberry, is an African American female who was employed at

Savannah River Remediation, LLC in a career that spanned approximately 23 years before she

was terminated in a Reduction in Force ("RIF")  on September 26, 2013, and not subsequently

rehired as per the National Defense Authorization Act under Rule 3161, in violation of state and

federal law.

2.      She is a citizen of Georgia and all times pertinent herein she resided in Hephzibah,

Georgia.

3.      The Defendant, Savannah River Remediation, LLC (hereinafter referred to as "SRR")

upon information and belief is a corporation organized and existing under the laws of Delaware

and other states of the United States of America, owning property and transacting business in

Aiken, South Carolina as a foreign LLC with its principal place of business located at 742-A Savannah River Site, Aiken, South Carolina 29808. .

4.      According to the South Carolina Secretary of State, the Defendant SRR may be served with process by delivering a copy of the summons and complaint to its registered agent CT Corporation System, 2 Office Park Court, Columbia, South Carolina 29223, Suite 103.

5.      The Defendant is an employer with five hundred (500) or more employees and is covered by Title VII.

6.       At all times relevant hereto the Defendant had an obligation under Title VII and all other applicable state and federal law to prevent race discrimination, to prevent retaliation for engaging in protected activity, and to be proactive as a federal contractor to create an effective operation or system to prevent work place discrimination.

## JURISDICTION AND VENUE

7.      This is an action under Title VII, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981, arising under the laws of the United States and South Carolina, and this Court has subject matter and personal jurisdiction under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 & 1343 (a)(3).

8.      A substantial part of the events or omissions giving rise to this claim occurred in Aiken, South Carolina, therefore, venue is proper in the United State District Court, District of South Carolina, Aiken Division pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391

9.      This Court has supplemental jurisdiction over any state claims under 28 U.S.C. § 1367 if filed.

10.     Plaintiff has complied with all prerequisites to the filing of this action.

11.     The Plaintiff first filed a claim with the Equal Employment Opportunity Commission (EEOC) on or about April 4, 2014, EEOC Charge Number 846-2014-06453, which is a like or

related claim which was investigated by the EEOC. The scope of that investigation included her claims that she was included in the RIF and laid off on September 26, 2013, based upon her race and in retaliation for participating in an investigation of discrimination which resulted in the firing of the white male, Robert Lash. The Plaintiff received a right to sue letter for that EEOC claim but did not file suit since she had filed a like or related charge of retaliation on September 14, 2014.

12.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on or about September 14, 2014, establishing her claim for retaliation for filing the April 4, 2014, EEOC claim of discrimination when the Defendant, in violation of its own Section 3161 policy failed to rehire her for vacant positions and instead rehired less qualified, white people, to fill those positions in Charge No. 436-2014-01018. Said charge was filed within 180 days of the alleged violations. (See EEOC Charge of Discrimination, Attached hereto as Plaintiff's Ex. 1).

13.     Within Charge No. 436-2014-0108, she also alleged that she had applied and interviewed for vacant positions for which she was qualified, that SRR had selected others outside of her protected class with less experience, and that Plaintiff had not been rehired.

14.     On about May 11, 2016, the EEOC issued a Dismissal and Notice of Rights, for EEOC Charge No. 436-2014-0108. (See Notice of Right to Sue, Attached hereto as Plaintiff's Ex. 2).

15.     This action is filed within ninety days of May 11, 2016, when the Dismissal and Notice of Rights was mailed by the EEOC. The Dismissal and Notice of Rights was not received by the Plaintiff until on or about August 1, 2016, when the notice was mailed to counsel for the Plaintiff, but in no event was the Notice received less than 3 days after the mailing of the Notice by the EEOC on May 11, 2016, and thus this action is timely filed.

## FACTS

16.     Savannah River Remediation, LLC ("SRR"), formerly operating as Westinghouse Savannah River Company, and Savannah River Nuclear Solutions, is a nuclear facility that has a contract with the United States government, governed by the Department of Energy, ("DOE"), and is subject to the provisions of Section 3161 of the National Defense Authorization Act.

17.     According to the Restructuring Plan for the Savannah River Site when there are eligible involuntarily separated employees pursuant to a reduction in force, those employees are to receive a hiring preference with respect to vacancies for positions for which they are qualified or could become qualified.  Where qualifications are approximately equal, eligible employees will be given preference in hiring consistent with applicable law, regulation or executive order.

18.     The Plan is designed to minimize the impact of restructuring on affected employees and the community through reassignment to jobs open within each respective contractor's workforce where employees can perform the work required, there is retraining assistance for internal job opportunities, and rehiring preferences for any involuntarily separated employees meeting eligibility requirements.

19.     The Section 3161 federal rule and policy required SRR to affirmatively contact employees who are eligible or who could become eligible with training for open positions prior to making the position public, and to give the eligible employees a preference in rehiring because they were laid off pursuant to a reduction in force.

20.     SRR did not follow the Section 3161 with regard to the Plaintiff for the positions that came open at the facility for which she was qualified or could have become qualified with training.

21.     At all times relevant hereto, the Plaintiff, who had worked at SRR since 1990 having worked her way up to a position as a Senior Radiological Inspector, level 20, in 1997, then to a Radiological First Line Manager, Level 31, in 2008, at the H-Tank Farm; and then to a Day Radiological First Line Manager, level 32, in 2013, at the Saltstone facility, was an eligible employee for the Section 3161 rehiring preference after she was involuntarily separated through a RIF on September 26, 2013.

22.     At all times relevant hereto she maintained her Statement of Interest in Maintaining Section 3161 Employment Eligibility and the Defendant was aware of her interest from September of 2013.

23.     Yet, the Plaintiff due to her race and retaliation by the Defendant was not treated the same as her similarly, situated white counterparts with regard to the application of Section 3161 Employment Eligibility. She was qualified for many positions, including her previous job, but was not given a preference or even considered for positions for which she was qualified or could have become qualified with training.

24.     The action and inaction taken by the Defendant has a chilling effect on African Americans' seeking to advance in their careers as high level managers, and those working at the site who seek to advance in their careers, obey the law, and protect others from a discriminatory, hostile work environment.

25.     The Saltstone facility is the nuclear facility that receives radioactive waste from H-Tank Farm. The waste is processed into radioactive grout material that is then stored in vaults or underground tanks for long term storage.

26.     Throughout her employment at SRR, the Plaintiff was considered a top performer. She received good written and oral evaluations. She trained other individuals at the site.

27.     It was known by management, Timothy Kerrigan, (Deputy Facility Manager), John Gall (Area Manager), and James Wilson (RPD Manager), all white males, that the Plaintiff was seeking, as an African American woman, to advance into management to higher levels where other African Americans were underrepresented.

28.     She was considered by Dave Olsen, former President of SRR, to be a valuable employee of SRR and a person with high standards and expectations for her career.

29.     Due to her demonstrated knowledge, leadership abilities and known desire to advance in the company to upper level management, on or about March of 2009, the Plaintiff was offered a position by Jim Wilson to be reassigned from H-Tank Farm to the Saltstone facility to become the First Day Radiological Manager at the Saltstone facility and she accepted.

30.     The facility had problems resulting from the lack of direct, reasonable or objective management. Prior to the Plaintiff accepting the management position, the facility had frequent contamination cases which was damaging for the site, and the department was not meeting its safety goals.

31.     Another African American female, Carol Hunter, was also assigned to the Saltstone facility which had major contamination problems.

32.     When assigned to the position, the Plaintiff was told by Mr. Wilson that her job was to stop the contamination cases.

33.     Before the Plaintiff was assigned to the Saltstone facility, there had not been an assigned Radiological First Line Manager assigned to work during the day time.  Plaintiff was the first, and SRR gave Plaintiff a crew of four workers who she would supervise to help with the effort.

34.     Prior to this time there were two First Line Managers positions on shifts, and one in Work Control.

35.     The Department Performance Indicator Reports show the large number of contamination cases prior to the Plaintiff and Carol Hunter being assigned to the facility.

36.     The STAR reports will show the findings and corrective actions that the Plaintiff was taking to reduce the number of contamination cases to zero.

37.     As the number of contamination cases decreased over the years, Carol Hunter, was replaced by Tim Kerrigan as the Deputy Facility Manager.

38.     Tim Kerrigan, a white male, did not meet the qualifications for the position prior to being placed in the position.

39.     Tim Kerrigan did not have a four-year degree or National Registry of Radiation Protection Technologists (NRRPT) certification which was required by Department of Energy regulations until a few weeks prior to the September 2013 RIF.

40.     During the time immediately preceding the RIF in 2013, which was used as a pretext for discrimination and retaliation to get rid of the Plaintiff, an African American male by the name of Aaron England lodged a complaint about White employees obtaining management positions without having the necessary qualifications.

41.     Tim Kerrigan only had a high school diploma, and so was not qualified to hold the position per the Department of Energy procedures.

42.     When it became apparent that this might become an issue, SRR let Kerrigan take the NRRPT certification, within two weeks before the actual lay off.

43.     On or about August 30, 2013, when he learned he had passed, Tim Kerrigan came to Plaintiff's office and did a happy dance.

44.     Tim Kerrigan was linking Plaintiff to the complaints about White employees holding management positions and not being qualified.

45.     Also, in the Spring of 2013, Plaintiff participated in an internal Equal Employment Opportunity ("EEO") investigation based upon an anonymous complaint regarding a white male by the name of Robert Lash who had made threats of violence against well known African American government figures, including President Obama, in the presence of other African American employees and as such he was alleged to have been creating a hostile work environment and making people uncomfortable.

46.     Plaintiff was asked by the internal EEO head Stephanie Franklin and Margaret Mazone, what she knew.  The Plaintiff participated in the investigation and told the investigator what she knew.

47.     Mr. Lash worked for a subcontractor and reported directly to Plaintiff on day shift.

48.     On several occasions, Mr. Lash had talked about his stash of weapons including a canon. Mr. Lash would spend time on the company computer exploring this obsession, even watching people get shot and killed which was against company policy.

49.     During the Plaintiff's participation in the EEO investigation, the Plaintiff informed the EEO that she had written Mr. Lash up on two occasions and that she had reported Mr. Lash to his shift Supervisor, James Lyons.

50.    During the Plaintiff's participation in the EEO investigation, the Plaintiff informed the EEO that she had also informed Tim Kerrigan that an African American employee had complained of continuous behavior by Mr. Lash of printing out racist political rhetoric using the company's computer.

51.    When the Plaintiff reported the document to Tim Kerrigan, his response was "Well it's all basically true right?

52.    The Plaintiff felt that Mr. Lash's conduct was creating an us against them "Black v. White" mentality and was contributing to a hostile work environment with no repercussions by management other than herself, an African American.

53.     Jim Wilson learned that Plaintiff had participated in the EEO investigation by being informed through management communications. Plaintiff updated Tim Kerrigan and Gall throughout the investigation.

54.    As a result of the investigation, it was recommended that Mr. Lash be terminated.

55.    Mr. Lyons, a white male, and Mrs. Stephanie Kissia, a white female came to Plaintiff and hinted around with suggestions that Plaintiff should take action to use her authority to protect Mr. Lash from termination.

56.    Tim Kerrigan was friends with Mr. Lash.  He refused to address his behavior even after knowing it disturbed other workers and the Plaintiff.

57.    As a result of the investigation, Mr. Lash was terminated on or about April 1, 2013.

58.    When the Plaintiff called Tim Kerrigan to inform him about Mr. Lash's termination because Tim Kerrigan was out of town in training and Plaintiff was acting in his stead, Tim Kerrigan told Plaintiff that he was not happy, and that "it" should not have happened.

59.    Tim Kerrigan said Mr. Lash did not get fired, because if you get "fired" you cannot come back to the site, and he was not an employee, and claimed that it was just that Mr. Lash's contract was not renewed.

60.    From April 1, 2013 and Mr. Lash's termination the terms and conditions of the Plaintiff's employment changed in that Tim Kerrigan began to treat the Plaintiff differently.

61.    The white managers were aware that a reduction in force was going to happen in 2013.

62.    Plaintiff was made to requalify on her job by passing an oral board which is normally comprised of an operations manager, a training manager, and two Radiological managers.

63.    Normally, Mr. Kerrigan would provide a mock training for the oral board but when asked by the Plaintiff to do so, he would not provide her the training.

64.    In addition, the Plaintiff's oral board consisted of DOE representative Gordon Smith unlike other similarly situated employees who were not African American, and who had not participated in the EEO investigation of Mr. Lash.

65.    Despite the refusal to provide her with preparation and training for the oral board and including the DOE examiner, the Plaintiff passed her oral board because of her knowledge and expertise in performing the job and requalified for her position on or about May 1, 2013.

66.    Since there was no legitimate basis to terminate Plaintiff, Tim Kerrigan, Jim Wilson and other decision makers used the RIF to get rid of the Plaintiff in retaliation for her participation in the EEO investigation.

67.    Since there was no legitimate basis to terminate Plaintiff, Tim Kerrigan and other decision makers used the RIF to get rid of the Plaintiff based on her race.

68.     The process and procedure used by the decision makers in determining who is included or excluded in a RIF is not applied in a non- discriminatory manner and whites and blacks are not treated the same.

69.     The process and procedure used by decision makers in determining who is included or excluded in a RIF is not applied in a non- discriminatory manner and those who engage in protected activity are not treated the same as those who do not engage in protected activity under Title VII and other federal and state laws.

70.     In the 2012 RIF, Latisha Bradley and Jacquetta Williams, African Americans, had more seniority than Allison Jennings and Brandon Hasty, both White, but Bradley and Williams were not allowed training opportunities to become grade 18 inspectors prior to Jennings and Hastings.

71.     Jennings and Hastings had less time as grade 16 inspectors and should not have been allowed to qualify before Bradley and Williams.

72.     Knowing that a RIF was looming, RPD Managers, including Tim Kerrigan, John Gall and others conspired to get White, less senior Grade 16 RCIs (Jennings and Hasty) qualified as 18s, without affording the same training opportunity, in the same timeframe, to the more senior RCIs, Bradley and Williams, who are African American.

73.     Then, when it came time for the RIF, Kerrigan, Gall and others used the qualification difference they helped orchestrate giving work benefits to Whites not given to African Americans, as a reason to lay off Latisha Bradley and Jacquetta Williams.

74.     Other managers at SRNS and SRR and predecessors have used the RIF process to terminate whistleblowers, in violation of regulations relating to the NRC, EEOC, environmental and toxic substances.

75.     Other managers have used the recurring RIFs as the means to terminate persons who are protected under the law as a result of their protected status based on race, gender or religion, or because the person engaged in protected activity by in some way opposing discrimination or retaliation.

76.     Although Jennings and Hasty were laid off in the September 2013 RIF, SRR rehired them a few months later. Plaintiff was the supervisor to Jennings, Hasty, Bradley and Williams.

77.     Also, even though SRR is under an agreement with the DOE to have a proactive affirmative action program, the RPD department has always been under-represented in minorities at all levels based on federal guidelines.

78.     When the Plaintiff asked her supervisor Mr. Kerrigan and Mr. Gall as to why she was included in the RIF, she was told they were not at liberty to tell her why.

79.     The Plaintiff had only received positive written evaluations prior to the  RIF.

80.     The Plaintiff had not received any negative oral or written evaluations prior to the RIF.

81.     Plaintiff had not received any disciplinary actions due to her conduct in her 23 year career and had always maintained her qualifications for her position including necessary security clearances.

82.     The reason for including Plaintiff in the RIF is simply a pretext for race discrimination and retaliation.

83.     The Plaintiff was the only African American to be included in the September 2013 RIF from her department.

84.     The Plaintiff was an African American female on the rise in management who had passed the oral boards necessary to requalify for her job despite management's refusal to train.

85.    Other similarly, situated, less qualified white first line managers were not included as a part of the RIF in September of 2013.

86.    Other similarly, situated first line managers who had not participated in an EEO investigation were not included as a part of the RIF in September of 2013.

87.    White employees who had violated company policy and who were less qualified than the Plaintiff were not included in the RIF.

88.    Deborah Woodward, who is White, was moved from H-Tank Farm to Defense Waste Processing Facility after having an inappropriate relationship with a direct report and using her site phone for sexting, yet she was not included in the RIF.

89.    John Gall and Jim Wilson were also her managers at the time of the RIF.

90.    John Gall and Jim Wilson were also Plaintiff's supervisors.

91.    Steve Terry, a White male, who worked as a day First Line Manager in H-Tank Farm was arrested for solicitation after using Craig's List while still at work to make an appointment with a prostitute, and he was not included in the RIF.  Jim Wilson was his supervisor and Plaintiff's supervisor.

92.    Anthony (Tony) Coleman had multiple arrests for DUI and he lost his license and could not even drive on site, and he was not included in the RIF.  Jim Wilson was his supervisor and Plaintiff's supervisor.

93.    Derek Colligan only had a total of five months of experience with SRR at the time of the September 2013 RIF and yet he was not included in the RIF whereas the Plaintiff had 23 years of experience including five in management.

94.    Joe Biggerstaff had been arrested for DUI.  Biggerstaff was not included in the RIF.

95.    SRR employees are required to maintain security clearances which would have been negatively impacted by this type of misbehavior.

96.    There are other Whites who were retained whose performance or misbehavior was overlooked and they were not included in the RIF but Plaintiff was.

97.    Jim Wilson had brought Plaintiff in to clean things up and solve problems that had not been addressed.

98.    Plaintiff fixed the contamination cases, which was a huge black mark on the company's record.

99.    Upon information and belief, the contamination problems were jeopardizing bonuses under the contract.

100.    Plaintiff had worked at every facility so she could have, if given the same consideration as was given Whites, been moved to another facility or left in Saltstone.

101.    Plaintiff had more qualifications and experience than others who were not laid off.

102.    The Plaintiff was included in the September 2013 RIF although she had more seniority than similarly, situated white employees like James Lyons, Neal Braxton, and others who were promoted after her who were not included in the RIF.

103.    Accordingly, on or about September 13, 2013, the Plaintiff filed a claim with the internal EEO Department at the SRR site when she was notified that she would be laid off as part of the RIF.

104.    The Plaintiff felt she was unfairly targeted for the RIF because of her race, African American, and her known plan to move up into upper level management.

105.    The Plaintiff felt she was being unfairly targeted for the RIF and within the scope of the EEO internal investigation included her allegation of retaliation for having participated in the

EEO investigation that resulted in the white male, Mr. Lash, a friend of her supervisor, Tim Kerrigan being terminated for making threatening comments regarding African American government officials.

## RETALIATION FOR FILING EEO and EEOC COMPLAINT

106.    The EEO Head, Stephanie Franklin investigated the Plaintiff's internal EEO investigation and put management on notice of the fact that the Plaintiff was alleging she was being included in the RIF because of her race and in retaliation for participating in the Mr. Lash investigation.

107.    Plaintiff was formally laid off pursuant to the RIF on September 26, 2013, without any indication as to why when her performance was good and the facility had met its goal regarding contamination cases.

108.    On or about April 7, 2014, Plaintiff filed Charge No. 846-2014-0643, with the EEOC alleging that she was laid off on September 26, 2013, due to a ranking system that was discriminatory and that she had co-workers outside her class with less experience, who had committed unprofessional acts but still remained employed.

109.    Upon information and belief, the Defendant managers were notified of her complaint to the EEOC regarding the RIF as well as her former internal EEO complaint.

110.    Notably, less than a year after the RIF, in May of 2014, and during the pendency of her EEOC charge investigation, Plaintiff noticed SRR posted the Radiological First Line Manager (FLM) job, her previous job, to the public.

111.    Jim Wilson was listed as the hiring manager for this position.

112.    In violation of Section 3161 of the National Defense Authorization Act, SRR posted the job for the public to apply without calling the Plaintiff or giving her consideration for her previous job position.

113.    SRR called other similarly situated white employees for positions that came open pursuant to the mandated policy of Section 3161.

114.    SRR called other similarly situation employees who had not complained to the internal EEO or EEOC about discrimination in the RIF selection process pursuant to the mandated policy of Section 3161.

115.    On or about May 20, 2014, Plaintiff completed an on-line application for the First Line Manager job.

116.    On or about May 21, 2014, SRR  contacted Plaintiff via email requesting Plaintiff to answer follow-up questions as a preliminary to ensure Plaintiff was qualified.

117.    SRR was aware that the Plaintiff was African American, and that she had filed an internal EEO charge about discrimination, and so rather than implement the preferential hiring policy and procedure under Section 3161, the Defendant actually cancelled the position all together.

118.    The Plaintiff was asked to apply for another job position.

119.    On or about July 19, 2014 Plaintiff reapplied for a new job,  #EC92580, and was granted an interview.

120.    However, Plaintiff was notified on or about September 4, 2014, by Cindy Head (deputy manager for Jim Wilson) that she did not get the job.

121.    In retaliation for having filed an internal EEO Complaint and a charge with the EEOC regarding the RIF, the Defendant refused to consider the Plaintiff for positions for which she was qualified and hired people with less experience.

122.    Upon information and belief, SRR rehired Robbie Hicks, white male, who was RIF'd in September 2013 during the layoff.  Hicks had a poor work performance, less experience and less qualifications than Plaintiff.

123.    Upon information and belief, SRR hired Joseph Butler, a white male, who was an inspector with no First Line Manager experience.

124.    Plaintiff's name was given as a suggestion for a training position to Cindy Head, but Cindy Head never called her for consideration and this failure to consider her was a violation of the Section 3161 policy. Cindy Head was the Deputy Manager for Plaintiff's former supervisor Jim Wilson and was aware of the Plaintiff's race and protected activity.

125.    Since September 13, 2013, Plaintiff has not been notified of the following jobs for which she was qualified or could become qualified within six months in violation of Section 3161: 1) First Line Manager, 2) Training Specialist, 3) ALARA Coordinator, 4) Waste Specialist, 5) Grade 20 Inspector, 6) Work Control Planner, 7) Operations Support Specialist, and others.

126.    Plaintiff was qualified and had demonstrated proficiency in the first six positions.

127.    Plaintiff can become qualified within six months for the Operations Support Specialist having worked in all of the SRR facilities with every work group.

128.    Plaintiff has education, experience and qualifications for many of the SRR jobs that would have existed since the September 2013 RIF.

129.    Plaintiff was deprived of the benefit of seniority under Section 3161, and less senior, or less qualified Whites were retained or rehired.

130.    SRR has called other employees who were less qualified, and who did not file complaints of discrimination or participate in an EEO investigation back to work under Section 3161.

131.    Plaintiff was making about $78,000 per year as base salary, and with extras made $93,000, not including vacation, 401K, and other benefits.

132.    Plaintiff was unable to secure a job in the area due to the specialized nature of her training and qualifications, and she now makes $37,000 as a teacher.

133.   Plaintiff's reputation has been tarnished after more than 23 years of devoting her life to a company and its predecessors with the belief that if you work hard, follow the law and the rules, you too can advance to senior level management despite your race.

134.   Plaintiff has suffered and with reasonable certainty, will continue to suffer mental anguish caused by the deprivation of the fundamental right to equal employment opportunities without regard to race or retaliation.

## LEGAL CLAIMS

## CLAIM I-TITLE VII RACE DISCRIMINATION

135.   Plaintiff incorporates each and every paragraph above as if stated herein.

136.   Title VII prohibits employers from using race as a factor in employment decisions.

137.   Title VII prohibits an employer from causing or allowing a hostile work environment related to race.

138.   The Plaintiff was an African American female who was on track to become a senior level manager at SRR.

139.   There has been a systematic disparity in the pay, and treatment in the terms and conditions of employment for African Americans for years.

140.   SRR, acting through its managing agents, denied the Plaintiff equal opportunities in her employment because of her race by including her in the RIF, while maintaining the employment of other similarly situated, less qualified, white people in an effort to keep her from advancing in the company and continuing to protect the civil rights of all employees.

141.   Managing agents of SRR, denied the Plaintiff employment opportunities after she was laid off in the RIF in 2013 based on her race.

142.    The claims of race discrimination in the terms and conditions of Plaintiff's employment are like or related to one another and can be considered one continuous action.

143.    Even though under Section 3161 the Defendant had a duty to consider that Plaintiff's seniority would move her ahead of others with less seniority, for any positon that came open for which she was, or potentially was qualified, race was a motivating factor in refusing to notify Plaintiff of the opening, and in refusing to consider Plaintiff for the positon.

144.    SRR's deviation and violation of the Section 3161 policy is evidence that the adverse employment actions taken against the Plaintiff were a pretext for discrimination.


## CLAIM II- TITLE VII RETALIATION FOR PARTICIPATING IN EEO INVESTIGATION

145.    Plaintiff incorporates each and every paragraph above as if stated herein.

146.    Title VII prohibits employers from retaliating and taking adverse employment actions in connection with protected activity which includes Plaintiff's participation in an internal EEO investigation.

147.    When the Plaintiff engaged in protected activity by participating in the EEO investigation against Mr. Lash regarding his creation of a racially hostile work environment with Plaintiff's write ups leading to his termination, she was the victim of tangible employment decisions that had an adverse impact on her employment of 23 years.

148.    These tangible employment actions include that the Plaintiff was not given the training she needed by Tim Kerrigan for her oral board, and a DOE employee was placed on her board, and that she was included in the RIF.

149.    SRR's deviation and violation of the Section 3161 policy is evidence that the adverse employment actions taken against the Plaintiff were a pretext for retaliation.

## CLAIM III- TITLE VII RETALIATION FOR FILING EEOC COMPLAINT

150.    Plaintiff incorporates each and every paragraph above as if stated herein.

151.    Title VII prohibits employers from retaliating and taking adverse employment actions in connection with protected activity which includes Plaintiff's filing of the EEOC charge alleging discrimination in the manner in which the Defendant chose to include the Plaintiff in the RIF.

152.    When the Plaintiff engaged in protected activity by filing her Complaint of race discrimination with the EEOC, SRR's actions of failing to abide by the Section 3161 policy in connection with Plaintiffs seniority, experience and qualifications, and not calling, offering, and out right refusing to consider Plaintiff for post RIF employment was intentional, malicious and in retaliation for Plaintiff's filing the charge of discrimination with the EEOC.

153.    Any subsequent refusal to rehire Plaintiff has been on account of one or more protected acts related to Plaintiff's participation in one  on one or more processes to prevent race discrimination against persons because they have participated in protected activity.

154.    The Defendant's blatant refusal to consider or hire Plaintiff for her own previous job position and instead recalling the position was intentional, malicious and retaliation that has a chilling effect on those continuing to work at SRR which needs to be stopped.

155.    SRR's deviation and violation of the Section 3161 policy is evidence that the adverse employment actions taken against the Plaintiff were a pretext for retaliation.

## CLAIM IV-SECTION 1981 RACE DISCRIMINATION

156.    Plaintiff incorporates each and every paragraph above as if stated herein.

157.    This claim is brought under 42 U.S.C. § 1981 which prohibits race discrimination in the workplace, and provides that African Americans have the right to make and enforce contracts, to sue, to be parties, give evidence, and to the full and equal benefit of all laws and proceedings as is enjoyed by white citizens.

158.    The Plaintiff's was included in the RIF on September 26, 2013, so as to keep her from advancing in management based upon her race, and SRR retained other less qualified, white people, with less seniority than the Plaintiff in violation of federal law.

159.    SRR's deviation and violation of the Section 3161 policy is evidence that the adverse employment actions taken against the Plaintiff were a pretext for retaliation.

160.    This claim is brought within 4 years of the date the Plaintiff was notified of the RIF and is timely.

## CLAIM V- SECTION 1981 RETALIATION CLAIM

161.    Plaintiff incorporates each and every paragraph above as if stated herein.

162.    This claim is brought under 42 U.S.C. § 1981 which prohibits private employers from committing retaliation in violation of federal law and is brought to remedy the retaliatory termination of the Plaintiff and retaliation by SRR in failing to rehire Plaintiff for employment after she participated in the formal EEO and EEOC process by lodging complaints of race discrimination.

163.    The Plaintiff was denied the same rights as white employees who qualified for the Section 3161 preference and who were called for job openings and rehired for job openings.

164.    Plaintiff seeks damages under 1981a, with costs and attorney's fees provided under § 1988.

165.    Plaintiff has suffered the loss of a career of 23 years which has resulted in lost wages and benefits, mental anguish and damage to her reputation and future employment in her field at other facilities.

**WHEREFORE,** Plaintiff prays that this Court:

A)    Afford Plaintiff a trial by jury on all issues so triable;

B)    Award Plaintiff damages to compensate her for all injuries proximately resulting from the Defendant's actions, in an amount to be determined by the enlightened conscious of the jury under Title VII and 42 USC § 1981a;

C)    Award Plaintiff punitive damages due to the intentional and deliberately indifferent nature of Defendant's conduct;

D)    Deem Plaintiff a prevailing party and award her attorneys' fees and expenses of litigation with costs and attorney fees provided under 42 USC § 1988;

E)    Award Plaintiff pre-judgment and post-judgment interest;

F)    Award Plaintiff, including but not limited to, back pay, reinstatement, front-pay;

G)    Mandate that the Defendant implement an objective process for implementing a legitimate reduction in force that is transparent and is not based upon subjectivity that can then be used as a pretext for discrimination and retaliation due to the inability to challenge the criteria in accordance with federal, state and executive orders governing federal contractors;

G)    Award Plaintiff such other equitable or monetary relief as the Court deems just and proper, including but not limited to reinstatement, the removal of any misleading, discriminatory, or retaliatory job performance information.

Respectfully submitted, this 10th day of August, 2016.

/s/ Tanya D. Jeffords
Tanya D. Jeffords
SC Bar No. 72401
Attorney for Plaintiff Saulsberry

/s/ John P. Batson
John P. Batson
GA Bar No. 042150
Tentative Pro Hac Vice
Attorney for Plaintiff Saulsberry

Tanya D. Jeffords
The Law Offices of Tanya D. Jeffords & Associates, P.C.
1431 Richland Avenue, West
Aiken, SC 29801
T       803-226-0001
F       803-226-0571
tjeffords@jeffordslaw.com
td.jeffords@comcast.net