# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### AIKEN DIVISION

| | | |
|---|---|---|
| Adrienne W. Saulsberry, | ) | |
| | ) | Civil Action No.: 1:16-cv-02792-JMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| | ) | |
| Savannah River Remediation, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court for review of the Magistrate Judge's Report and Recommendation ("Report") filed on March 28, 2019. (ECF No. 68.) The Magistrate Judge recommends that the court grant in part and deny in part Defendant Savannah River Remediation, LLC's ("SRR") Motion for Summary Judgment (ECF No. 45), which concerned Plaintiff Adrienne W. Saulsberry's ("Saulsberry") claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, and 28 U.S.C. § 1981. (*Id.* at 13–14.) The Magistrate Judge recommended that the court grant in part and deny in part SRR's Motion for Summary Judgment. (*Id.* at 1, 13–14.)

On June 25, 2019, the court heard arguments from SRR and Saulsberry about their specific objections to findings within the Magistrate Judge's Report. (ECF No. 81.) After careful consideration of SRR's Motion for Summary Judgment, the Magistrate Judge's Report, both parties' objections to the Magistrate Judge's Report, and the parties' arguments at the hearing, the court **ACCEPTS IN PART** and **REJECTS IN PART** the Magistrate Judge's Report. Accordingly, the court **GRANTS IN PART** and **DENIES IN PART** SRR's Motion for Summary Judgment (ECF No. 45). Specifically, the court **GRANTS** SRR's Motion as to Saulsberry's claims

based upon her termination in SRR's 2013 Workforce Reduction ("WFR"), but **DENIES** SRR's Motion concerning Saulsberry's Title VII and § 1981 disparate treatment claims based upon (1) intentional race discrimination in failing to hire her for the 2014 First Line Manager ("FLM") position; (2) retaliation, taking the form of her rejection from the 2014 FLM position, for filing a charge with the Equal Employment Opportunity Commission ("EEOC") in April 2014 and an internal grievance beforehand; and (3) a failure to hire her for any positions for which she did not apply.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Saulsberry is an African-American female who possesses an undergraduate degree in chemistry and also a graduate degree in education. (ECF No. 45-2 at 6.) Since the age of nineteen (19), Saulsberry has been previously employed by SRR, a nuclear facility located in Aiken, South Carolina, and worked for SRR for approximately twenty-three (23) years. (ECF No. 1 at ¶ 1; ECF No. 61-3 at 1 ¶ 1, 4 ¶ 16.) When starting her career with a predecessor to SRR, Saulsberry initially worked in a clerical department. (ECF No. 45-2 at 7.) In 1994, Saulsberry eventually became employed with SRR as a Radiological Control ("RADCON") inspector, a worker who specializes in examining, handling, and surveying radioactive sources. (*Id.*; ECF No. 61-4 at 2.) In 2006, Saulsberry was promoted to a Radiological Control Work Planner, a position she held until she received another promotion in 2008. (ECF No. 61-4 at 1.) From 2008 to 2013, Saulsberry worked as a FLM, which required her to perform a variety of management and supervisory duties at SRR, including, but not limited to, ensuring the radiological health of employees, the monitoring of nuclear workers, and the performance of audits. (*Id.*) Saulsberry's supervisors were John Gall and Timothy Kerrigan, both of whom seemed to report to Jim Wilson. (ECF No. 45-2 at 11; ECF No. 68 at 2.) During her lengthy tenure with SRR, Saulsberry never received any "written warnings or

disciplinary actions" regarding her job performance. (ECF No. 61-5 at 3.) In fact, in March 2013, SRR recognized Saulsberry for her contributions, and she received a salary increase. (ECF No. 61-6 at 1.)

On or about September 2013, SRR was notified by the Department of Energy ("DOE") that the funding levels to support its liquid waste operations would decrease by approximately one hundred million dollars ($100,000,000.00). (ECF No. 45-1 at 5; ECF No. 45-2 at 79–80.) As a result of the funding cut, SRR purportedly terminated approximately two hundred and ninety (290) employees pursuant to its WFR, and it notified Saulsberry that she was part of the WFR on September 13, 2013, resulting in her effective termination on September 27, 2013. (ECF No. 45-1 at 5; ECF No. 45-2 at 11, 117; ECF No. 61-42 at 1.) Upon her termination from SRR, Saulsberry filed an internal complaint with the company on September 17, 2013,[1] alleging that she was selected for the WFR because of her race and for previously opposing race discrimination in the workplace. (ECF No. 61-10 at 1–3.) SRR's internal investigation concluded that Saulsberry's selection for the WFR was not because of her race. (*See* ECF No. 61-14.) Stephanie Franklin, an employee of SRR's Human Resources Department, interviewed other employees within SRR, including Saulsberry, Patricia Allen, Tim Kerrigan, Mildred Jackson, Jim Wilson, Carol Hunter,

---

[1] Around September 2012, Saulsberry participated in a workplace investigation regarding Robert Lash, a contract employee who allegedly made "inflammatory remarks" about President Barack Obama. (ECF No. 45-4 at 1–2.) Before the formal investigation commenced, on January 24, 2012, Saulsberry notified individuals within SRR about a document, presumably created by Lash, which criticized President Obama by saying, among numerous other statements, that President Obama had "[twenty-two] 22 personal servants (taxpayer funded) for his wife" and was able "to break [numerous] laws . . . simply because he's black." (ECF No. 45-2 at 13–15, 65–66.) Also, on June 26, 2012, Saulsberry purportedly heard "offensive and divisive" statements from Lash. (*Id.* at 14.) In an e-mail on that same day, Saulsberry notified officials within SRR that she observed Robert Lash "ranting and raving" about President Obama and Attorney General Eric Holder, calling them "marxist, socialist, communist, etc." (*Id.* at 14, 66.) Lash's contract with SRR ultimately ended. (*Id.* at 15.)

Kimberly Arlen, Margaret Mozone, John Gall, and Cindy Head. (ECF No. 45-1 at 10; ECF No. 45-14 at 8–9.) As a result of her internal investigation, Franklin was unable to conclude that Saulsberry's selection for the WFR resulted from unlawful discrimination. (ECF No. 45-2 at 44; ECF No. 61-58 at 11–12.) Upon learning of SRR's finding, on April 7, 2014, Saulsberry then filed a formal charge with the EEOC. (ECF No. 45-2 at 129.)

Because she was terminated as part of the WFR, Saulsberry was eligible for a hiring preference developed pursuant to Section 3161 of the National Defense Authorization Act for Fiscal Year 1993. Pub. L. No. 102-484, § 3161, 106 Stat. 2315, 2644–46 (1992) (codified at 50 U.S.C. § 2704). Adhering to Section 3161, SRR adopted its Workforce Restructuring Plan for the Savannah River Site ("Workforce Restructuring Plan"). (ECF No. 45-2 at 72.) Pursuant to the Workforce Restructuring Plan, "[t]o the extent practicable, eligible involuntarily separate contractor employees who meet the eligibility requirements contained in this Plan *will receive a hiring preference with respect to vacancies for positions for which they are qualified*, or, to the extent practicable in the circumstances, *for which they may become qualified*." (ECF No. 45-2 at 86 (emphasis added).) In order to obtain the preference, eligible employees were required to "recertify" their eligibility for the preference on a yearly basis. (*See id.*) Both parties agree that Saulsberry complied with these procedures for the hiring preference under Section 3161 and held the preference in 2013, 2014, and 2015. (ECF No. 45-1 at 9; ECF No. 45-9 at 6–7; ECF No. 61 at 10; ECF No. 61-18 at 1–3; ECF No. 61-38 at 1.) Gayl Hoel, an employee within the Human Resources Department at SRR, would "usually . . . call" individuals and "ask them what they were interested in" if they were eligible for the preference. (ECF No. 45-9 at 6–7.) Hoel expressly states that she called individuals after the WFR, but did not keep notes about which individuals she called about job positions. (*See id.*)

Around May 18, 2014, Saulsberry found SRR's posting for a FLM position and decided to apply. (ECF No. 61-3 at 1.) When Saulsberry submitted her application, individuals within SRR noted that there was "sensitivity surrounding" her application to the position, but those individuals did not specifically detail what that "sensitivity" entailed. (ECF No. 61-49 at 1.) Nevertheless, on June 16, 2014, SRR cancelled the posting viewed by Saulsberry and re-posted the position.[2] (ECF No. 61-25 at 1.) Saulsberry applied for the subsequent posting of the FLM position after being notified of the reposting that impacted her previous application. (ECF No. 45-2 at 32; ECF No. 61-3 at 2; ECF No. 61-59 at 26.) Saulsberry maintains that she never received a courtesy call or proactive communication regarding any vacancies at SRR, however, Robert Hicks, a white male who was also part of the WFR in 2013 and provided with retirement benefits, received a phone call from a friend employed at SRR informing him of available positions. (ECF No. 45-2 at 30–31; ECF No. 45-13 at 4–5; ECF No. 61-3 at 2.) DOE acknowledges that SRR contacted former employees "who may have been eligible" for the hiring preference.[3] (ECF No. 61-21 at 3.) In August 2014, Saulsberry, along with four (4) other candidates, was selected for an interview for the 2014 FLM position. (ECF No. 61-62 at 17.) The other individuals selected for interviews included Joseph Butler, Robert Hicks, Alyson Jennings, and David Travis, all of whom were white. (ECF No. 61-62 at 14, 20, 33.) Of all of these candidates, as indicated in an e-mail from Gayl Hoel and depositions from some of the interviewees, only Saulsberry was eligible for the hiring preference under Section 3161, while the others were not. (*See* ECF No. 45-13 at 5; ECF No. 61-

---

[2] Apparently, on May 21, 2014, officials within SRR were concerned that the initial posting, for which Saulsberry applied, was only for internal candidates, not external candidates, and desired to make the position publicly available. (*See* ECF No. 61-23 at 1; ECF No. 61-49 at 1.)

[3] DOE suggests that SRR "proactively contacted Saulsberry and informed her that SRR was hiring." (ECF No. 61-21 at 2–3.) However, Saulsberry contends that the proactive communication to which DOE refers was only a result *of her independent* communications with SRR about her previous application (ECF No. 61-3 at 1–2.)

26 at 1.) However, for some reason, although he was not eligible, SRR allowed Robert Hicks to be categorized as a preferential applicant under Section 3161. (*See* ECF No. 61-26 at 1; ECF No. 61-21 at 3.) Moreover, Saulsberry previously supervised both Robert Hicks and Alyson Jennings when she was a FLM, and she also received a higher score than Robert Hicks for rankings used during the WFR.[4] (ECF No. 61-28 at 2; ECF No. 61-63 at 4; ECF No. 61-43 at 1; ECF No. 61-57 at 1.) Of particular note, Alyson Jennings was not qualified for the position, but she received an interview. (*See* ECF No. 61-3 at 3–5; ECF No. 61-62 at 19.)

On August 21, 2014, all four (4) candidates were interviewed by a panel consisting of three (3) different managers at SRR, specifically: (1) Cindy Head, the SRR Hiring Manager (white);[5] (2) Charles Lampley, the SRR Training Manager (African-American); and (3) Chuck Sanders, the Safety and Health Manager (white). (*See* ECF No. 45-1 at 11 n.14; ECF No. 61-62 at 17–21.) Cindy Head was previously involved in at least one (1) discrimination complaint lodged by Saulsberry. (ECF No. 61-14 at 3; ECF No. 61-62 at 25.) The interview evaluation consisted of questions examining an applicant's leadership, management, teamwork, and technical abilities, among numerous other considerations, and the scores therefrom were eventually weighted. (*Id.* at 84–88.) Robert Hicks received the highest interview score, followed by Joseph Butler, Alyson Jennings, David Travis, and, finally, Saulsberry. (*See id.*; ECF No. 61-30 at 1.) While the interview panel acknowledged that Saulsberry "has experience" as a FLM, they decided that she "demonstrates obvious weakness in leadership and soft skills that would require significant

---

[4] In 2010, Robert Hicks also received a "corrective action" for unscheduled absences directly from Cindy Head, his interviewer for the 2014 FLM position. (ECF No. 61-62 at 23–24, 36.)

[5] As somewhat conceded by SRR (ECF No. 73 at 8), James Wilson was initially the hiring manager as it concerned the 2014 FLM position, or, at a minimum, he played a role in the hiring process. (*See* ECF No. 61-60 at 20; ECF No. 61-51 at 1; ECF No. 61-64 at 241.) However, James Wilson provided conflicting testimony that he was not the hiring manager for the 2014 FLM position. (ECF No. 61-60 at 18, 20.)

management oversight." (ECF No. 61-30 at 1.) Ultimately, Saulsberry was not hired for the position, and, instead, SRR hired Robert Hicks and Joseph Butler, the two applicants who received the highest interview scores that day. (ECF No. 61-62 at 36; ECF No. 61-59 at 26.) In essence, even though they may not have been the most qualified holistically, according to SRR, individuals receiving the highest interview scores *on that day* were selected for the 2014 FLM position. (*See* ECF No. 45-1 at 31; ECF No. 61-62 at 35–37; ECF No. 73 at 10.)

After these events, because she was not hired for the 2014 FLM position, Saulsberry filed another charge with the EEOC on September 14, 2014. (ECF No. 45-2 at 131.) After filing her charge, additional FLM positions became open in 2015, however, Saulsberry was not contacted about those positions, purportedly because of an administrative oversight at SRR. (ECF No. 61-21 at 3.) Interestingly, Gayl Hoel stated that she had made courtesy calls to encourage Section 3161 employees to apply for positions, but she cannot specifically remember whether she called preferential employees in 2015, the time during which these three (3) FLM positions were open. (ECF No. 61-66 at 17.) On May 11, 2016, Saulsberry was advised of her right to initiate suit against SRR within ninety (90) days by the EEOC. (ECF No. 45-2 at 133.) Subsequently, Saulsberry commenced the instant action. (ECF No. 1.)

Saulsberry filed her Complaint in the United States District Court for the District of South Carolina on August 10, 2016. (*Id.*) Within her Complaint, Saulsberry brings the following claims, all on the grounds of race, against SRR: (1) intentional discrimination under Title VII as it relates to her inclusion in the WFR, application for the 2014 FLM position, and future positions for which she did not apply; (2) retaliation under Title VII concerning her inclusion in the WFR after her participation in an investigation with the EEOC; (3) retaliation under Title VII for SRR's refusal to rehire her for the 2014 FLM position after she filed a Complaint with the EEOC; (4) intentional

discrimination under 42 U.S.C. § 1981 for her inclusion in the WFR; and (5) retaliation under 42 U.S.C. § 1981 for SRR's refusal to rehire her after she filed complaints of race discrimination. (*Id.* at 18–22 ¶¶ 135–65.) After extensive discovery between the parties, SRR filed its Motion for Summary Judgment "as to all of" Saulsberry's claims on September 14, 2018. (ECF No. 45 at 1.) Saulsberry filed her Response in Opposition to SRR's Motion on February 5, 2019, maintaining that she has presented sufficient evidence to proceed to a jury. (ECF No. 61.)

The Magistrate Judge filed her Report, providing a recommendation about SRR's Motion, on March 28, 2019. (ECF No. 68.) Within the Report, the Magistrate Judge first recognized that Saulsberry did not oppose SRR's Motion concerning claims about her selection for the WFR or SRR's failure to hire her for future positions for which she did not apply. (*Id.* at 6 n.2.) Secondly, as it related to the 2014 FLM position, the Magistrate Judge reasoned that Saulsberry established her *prima facie* case of disparate treatment and retaliation. (*Id.* at 6–13.) Concerning her disparate treatment claim of the 2014 FLM position, the Magistrate Judge found that there was sufficient evidence to "reasonably support an inference that white former employees were treated more favorably than Saulsberry in connection with the 3161 rehiring preference." (*Id.* at 7.) For example, the Magistrate Judge noted that the record "supports an inference that SRR affirmatively undertook 'courtesy calls' to certain former employees who were white but not Saulsberry" and that the rehiring preference does not compel the application of the preference only when two applicants are "identically qualified." (*Id.* 7–8 (citations omitted).) Further analyzing Saulsberry's disparate treatment claim, the Magistrate Judge concluded that Saulsberry provided sufficient evidence of pretext to reach a jury because (1) she possessed superior qualifications to other applicants for the position, (2) other applicants did not even have the minimum qualifications for the job, (3) ineligible applicants were questionably given a hiring preference, and (4) e-mails suggest that

employees within SRR opined that there was "sensitivity surrounding" her situation and that Saulsberry should be "unconsider[ed]" from the 2014 FLM position. (*Id.* at 9–11.) For many of the same reasons, the Magistrate Judge also reasoned that Saulsberry's retaliation claim should also proceed to trial. (*Id.* at 12.) According to the Magistrate Judge, a causal connection exists between the adverse action suffered by Saulsberry and her protected activity because "some members of the interview panel were interviewed in connection with [an] internal investigation into Saulsberry's complaint." (*Id.*) In rejecting SRR's temporal proximity argument to causation, the Magistrate Judge emphasized that Saulsberry was terminated "before filing the EEOC charge and [SRR] therefore had no opportunity to retaliate until much later when [she] reapplied for a job." (*Id.* at 12–13.) For all of those reasons, the Report recommends that the court grant SRR's Motion as to the WFR and future positions for which Saulsberry did not apply, but deny SRR's Motion concerning status-based discrimination and retaliation for the 2014 FLM position. (*Id.* at 13–14.)

The Magistrate Judge also notified the parties of the opportunity to file specific objections to the Report. (*Id.* at 15.) Both the SRR and Saulsberry timely filed objections to the Magistrate Judge's Report. (ECF Nos. 73, 74.) SRR first alleges that the Magistrate Judge erred by finding that Saulsberry established a *prima facie* case regarding the 2014 FLM position and should not have used a general, disparate treatment standard, but the failure-to-hire standard for disparate treatment cases. (ECF No. 73 at 2.) SRR emphasizes that it had no obligation to contact Saulsberry about open positions, did not contact individuals in a discriminatory manner, and Section 3161 does not mandate that SRR affirmatively contact employees eligible for a hiring preference. (*Id.* at 3–5.) SRR also argues that it complied with Section 3161 and properly used it as a "tie breaker," in contrast to the Magistrate Judge's interpretation of Section 3161 that rejected its interpretation

of the policy being used as a "tie breaker." (*See id.* at 7–9.) Lastly, SRR objects to the Magistrate Judge's findings regarding Saulsberry's retaliation claims, maintaining that Saulsberry failed to establish a *prima facie* case and provide any evidence of pretext. (*Id.* at 17–18.) SRR requests that the court grant the entirety of its Motion for Summary Judgment and reject the Magistrate Judge's Report. (*Id.* at 18.) Saulsberry replied to SRR's Objections on June 13, 2019, largely emphasizing that the Magistrate Judge correctly found that there was sufficient evidence establishing her *prima facie* case and showing that SRR's actions were pretextual. (ECF No. 76.)

On May 30, 2019, Saulsberry filed her Objections. (ECF No. 74.) As an initial matter, Saulsberry "agrees with the [c]ourt" and concedes that her claims regarding the WFR will not proceed to a jury because she did not file her suit within ninety (90) days as it relates to those claims. (ECF 74 at 2 n.1.) Nevertheless, Saulsberry maintains that the Magistrate Judge erred in determining that she abandoned her discrimination and retaliation claims concerning future FLM positions for which she did not apply. (*Id.* at 2.) Saulsberry submits that SRR "appears to have misled the [c]ourt into believing that [it] had actually moved for summary judgment on [her] third claim of discrimination . . . ." (*Id.*) Saulsberry vigorously argues that SRR "never once mentioned that the [c]ourt should dismiss [her] claims for positions that came open after 2014 based upon the grounds that [she] did not apply." (*Id.* at 5.) Essentially, Saulsberry notes that SRR never moved for summary judgment as to that claim. (*See id.*) After identifying that SRR failed to move for summary judgment as to her final ground for discrimination, Saulsberry contends that there is a genuine issue of material fact as it relates to that claim. (*Id.* at 6–10.) For those reasons, Saulsberry requests that the court overrule SRR's Objections and deny in part SRR's Motion for Summary Judgment. (*See id.* at 9.)

The court heard arguments from both parties on June 25, 2019. (ECF No. 81.) SRR

emphasized that the Magistrate Judge erred by concluding that Saulsberry established a *prima facie* case of race discrimination and further argued that it complied with the hiring preferences mandated by federal law. SRR particularly stressed the Magistrate Judge's findings of pretext. In response, Saulsberry maintained that the Magistrate Judge improperly recommended summary judgment as to her claims regarding open FLM positions for which she did not apply and urged the court to adopt the remaining aspects of the Magistrate Judge's Report. Because this matter has been extensively briefed and argued, it is now ripe for the court's review. *See generally Sauls v. Wyeth Pharm., Inc.*, 846 F. Supp. 2d 499, 501 (D.S.C. 2012) ("The parties have fully briefed the issues, and this matter is ripe for consideration.").

## II. LEGAL STANDARD

### A. **The Magistrate Judge's Report and Recommendation**

The Magistrate Judge's Report is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 for the District of South Carolina. The Magistrate Judge only makes a recommendation to this court, and the recommendation has no presumptive weight. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). The responsibility to make a final determination remains with the court. *Id.* at 271. As such, the court is charged with making de novo determinations of those portions of the Report and Recommendation to which specific objections are made. *See* 28 U.S.C. § 636(b)(1). *See also* FED. R. CIV. P. 72(b)(3). In the absence of specific objections to the Magistrate Judge's Report, the court is not required to give any explanation for adopting the Report. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Rather, "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting FED. R. CIV.

P. 72 advisory committee's note). Thus, the court may accept, reject, or modify, in whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

## B.  Summary Judgment

A federal court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). In a summary judgment motion, "[a] court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

In other words, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing FED. R. CIV. P. 56(c)). Nevertheless, "the nonmoving party . . . must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor.'" *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). Summary judgment is therefore appropriate "when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322–23).

At the summary judgment stage, a factual dispute raised by a non-moving party must be "genuine" and "material." *See* FED. R. CIV. P. 56(a). To determine if a fact is "material," a federal court is guided by the substantive law at issue, which will identify the facts that are material and those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. The United States Supreme Court has instructed that the substantive law identifies "which facts are critical and which facts are irrelevant . . . ." *Id.*

Put simply, "[a] fact is 'material' if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case." *Agee v. Wayne Farms LLC*, C/A Nos. 2:07cv1010–KS–MTP, 2:07cv1011–KS–MTP, 2008 WL 5398743, at *1 (S.D. Miss. Dec. 19, 2008) (citing *Anderson*, 477 U.S. at 248). *See generally Polycast Tech. Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244, 249 (S.D.N.Y. 1992) ("While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law."); *Allstate Ins. Co. v. Shockley*, 793 F. Supp. 852, 854 (S.D. Ind. 1991) ("Moreover, the mere existence of a factual dispute is not by itself sufficient to bar summary judgment; the disputed fact must be outcome determinative." (citations omitted)). A fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The mere existence of "some alleged factual dispute" is insufficient to defeat a well-supported summary judgment motion. *Anderson*, 477 U.S. at 247–48. "A dispute over irrelevant or unnecessary facts will not preclude summary judgment, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment." *GSGSB, Inc. v. N.Y. Yankees*, 862 F. Supp. 1160, 1170 (S.D.N.Y. 1994) (citations omitted). *See also Anderson*, 477 U.S. at 249–50 (stating that summary judgment may be granted when the evidence is merely "colorable" or "not significantly probative").

# III. DISCUSSION

## A. <u>Claims Regarding the Workforce Reduction</u>

As an initial matter concerning the WFR, Saulsberry's Complaint expressly alleges that SRR "denied [her] equal opportunities in her employment because of her race by including her in the [WFR], while maintaining the employment of other similarly situated, less qualified, white people in an effort to keep her from advancing in the company and continuing to protect the civil rights of all employees." (ECF No. 1 at 18 ¶ 140.) Saulsberry essentially alleges a disparate treatment claim for her inclusion in the WFR. (*See id.*) Additionally, the Complaint mentions, as to unlawful retaliation, that Saulsberry's placement in the WFR was a tangible employment action. (*See id.* at 19 ¶ 147.)

To the extent that she put forth these discrimination claims involving the WFR, Saulsberry expressly concedes that these claims may not survive summary judgment, and she specifically states that she "agrees with the [c]ourt that her claims regarding the [WFR] are not going forward to the jury." (ECF No. 74 at 2 n.1.) Conceding that she did not file suit on those claims within ninety (90) days, Saulsberry instead seeks to use the circumstances surrounding the WFR as "prior acts and background evidence in support of her timely employment claim." (*Id.*) Because of Saulsberry's concession as it relates to her claims for status-based discrimination and retaliation in the context of the WFR, the court finds that summary judgment is warranted and grants SRR's Motion in this regard. *See* Fed. R. Civ. P. 56(a). *See generally Loustaunau v. Ethicon, Inc.*, C/A No. 2:12-cv-00666, 2017 WL 988110, at *1–2 (S.D.W. Va. Mar. 14, 2017) (granting summary judgment as to claims conceded by co-plaintiffs); *Mims v. City of Eugene*, No. Civ. 02–6009–HO, 2003 WL 23671157, at *2 (D. Or. Sept. 16, 2003) (granting summary judgment as to a procedural due process claim because a plaintiff "concede[d] th[e] claim").

**B. <u>The 2014 FLM Position</u>**[6]

*i. <u>Saulsberry's Disparate Treatment Claim</u>*

Title VII of the Civil Rights Act of 1964 declares that it is "an unlawful employment practice for an employer–*to fail or refuse to hire* or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In order for a plaintiff to prevail in a discrimination action under Title VII, ultimately, he or she must demonstrate that "race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, *even though other factors also motivated the practice*." 42 U.S.C. § 2000e-2(m) (emphasis added). As such, status-based discrimination claims are commonly referred to as "mixed-motive" claims because an employer's mere consideration of a prohibited characteristic–in and of itself–is sufficient to impose liability, even if other permissible reasons motivated the employment decision. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92–93 (2003).

It is an elementary, well-established principle of Title VII law that a claimant need not present direct evidence of intentional discrimination in order to reach a jury. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) ("Where, as here, a plaintiff does not allege direct evidence of

---

[6] The court's instant analysis applies equally to Saulsberry's claims pursued under 42 U.S.C. § 1981. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (noting that a claimant's "circumstantial case" required the same elements under Title VII and section 1981); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 n.1 (4th Cir. 2002) ("As an initial matter, we note that the elements required to establish a prima facie case are the same under Title VII and [s]ection 1981; therefore, the district court properly considered these claims together." (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985))). *See also Mallory v. Booth Refrigeration Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989).

discrimination, a plaintiff asserting discriminatory treatment under Title VII may avoid summary judgment by proceeding under the burden[-]shifting framework established in *McDonnell Douglas . . . .*"). *See also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015); *Price v. Thompson*, 380 F.3d 209, 214–15 (4th Cir. 2002). A plaintiff is at liberty to choose whether he or she wishes to present direct evidence of an intentional discrimination claim or proceed under the burden-shifting framework, which utilizes both circumstantial evidence and an inferential scheme, first laid down by *McDonnell Douglas*. *See Foster*, 787 F.3d at 249; *Diamond*, 416 F.3d at 318 n.4. Pursuant to *McDonnell Douglas'* burden-shifting framework, and to show a *prima face* in the failure-to-hire context, "a plaintiff must prove that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination."[7] *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (citations omitted). A plaintiff must establish a *prima facie* case by a preponderance of the evidence. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff successfully demonstrates a *prima facie* case, the burden of production, and not the burden of persuasion, shifts to the employer "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* at 254–55. *See also St. Mary's Honor Ctr. v. Hicks*, 509

---

[7] SRR contends that the Magistrate Judge's Report did not use a failure-to-hire framework when evaluating its Motion. (ECF No. 73 at 2.) Within the Report, the Magistrate Judge did not explicitly use a failure-to-hire standard, but, instead, used a burden-shifting framework for a discriminatory discharge claim arising under Title VII. (*See* ECF No. 68 at 6 (citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).) Here, Saulsberry's Title VII claim concerning the 2014 FLM position is exclusively grounded upon SRR's failure to hire her for the position, not being discharged from that position. (*See* ECF No. 1 at 18–19 ¶¶ 135–44.) Because the Magistrate Judge's Report did not use a burden-shifting framework involving a failure-to-hire standard, the court is constrained to reject the Report.

U.S. 502, 507 (1993) (citation omitted); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (citations omitted). If an employer offers a legitimate, nondiscriminatory reason for hiring an individual, thereby satisfying its burden of production, "the employee must then demonstrate that the defendant's proffered reason is pretextual." *Haynes*, 922 F.3d at 223 (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011)). *See also McDonnell Douglas Corp.*, 411 U.S. at 804. When showing pretext, the plaintiff must prove that an employer's "proffered reason was not the true reason for the employment decision," and he or she may succeed in this showing "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Burdine*, 450 U.S. at 256 (citation omitted). Importantly, rejecting an employer's legitimate, nondiscriminatory reason does not compel judgment for a plaintiff because the ultimate question is whether a plaintiff is the victim of unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47 (2000) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511, 524). In *Reeves*, the Court clarified that, in some instances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148 (emphasis added). Clarifying what satisfies the pretext inquiry, the United States Court of Appeals for the Fourth Circuit has recently held that a pretext showing is satisfied when "an employer's proffered nondiscriminatory reasons . . . are inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225 (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)). When an employer proffers "post hoc rationalizations invented for the purposes of litigation," there may be sufficient evidence of pretext. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 576 (4th Cir. 2015) (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*,

290 F.3d 639, 647 (4th Cir. 2002)). A trier of fact may also find pretext when an employer engages in a "selective application" of neutral policies and "ever-changing rationales . . . to conceal an intent" of discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 299 (2010). Moreover, when attempting to show pretext, a claimant must go "beyond baseless speculation." *Holland*, 487 F.3d at 217. At all times during this burden-shifting inquiry, the burden of persuasion remains with the plaintiff to establish intentional discrimination. *See Burdine*, 450 U.S. at 256.

To establish her *prima facie* case in the failure-to-hire context, Saulsberry must show the following: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *See Brown*, 159 F.3d at 102. First, viewing the facts in the light most favorable to Saulsberry, without dispute among the parties, she is an African-American female (ECF No. 1 at 1; ECF No. 45-1 at 9 n.10; ECF No. 45-7 at 33), and thereby protected by Title VII. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278–80 (1976). Secondly, Saulsberry affirmatively applied for the 2014 FLM position shortly after she learned of its posting, demonstrating that she applied for the position in question. (*See* ECF No. 45-2 at 32; ECF No. 61-3 at 2; ECF No. 61-59 at 26.) Third, as expressly conceded by SRR's Motion (ECF No. 45-1 at 12), Saulsberry was qualified for the 2014 FLM position because she previously worked as a FLM and, under SRR's own policies, she should not have received an interview if she was not qualified for the position. (*See* ECF No. 61-3 at 3–5; ECF No. 61-4 at 1; ECF No. 61-62 at 19.)

As to the last element of her *prima facie* case, Saulsberry must also provide evidence that she was rejected for the position under circumstances raising an inference of discrimination. *See Sears*, 243 F.3d at 852. The last element may be shown when an employer hires or promotes an

individual who is of the opposite race and less qualified for the position. *See id. See also Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994) (finding that an African-American plaintiff satisfied the fourth prong of a *prima facie* case when he showed that the selectee of the position for which he applied was white). Here, Robert Hicks and Joseph Butler, both of whom are white males, were ultimately selected for the 2014 FLM position. (ECF No. 61-62 at 36; ECF No. 61-59 at 26.) Saulsberry has provided evidence that she previously supervised Robert Hicks in a managerial capacity, which shows that she was more qualified for the position. (ECF No. 61-28 at 2.) She has also produced evidence showing that she received a higher performance rating than Robert Hicks when selections were made for the WFR. (ECF No. 61-43 at 1; ECF No. 61-57 at 1.) Lastly, Robert Hicks, a white male, was given a hiring preference under Section 3161 when he was not eligible for that preference, and SRR does not even attempt to contest this critical fact. (*See* ECF No. 61-26 at 1; ECF No. 61-21 at 3; ECF No. 73 at 6–10.) Given that Saulsberry previously held a FLM position, outranked both Robert Hicks and Joseph Butler, two white males, in her previous job capacity, outperformed Robert Hicks when decisions were made about selecting individuals for the WFR, and Robert Hicks was given a hiring preference for which he was not eligible, Saulsberry, who is African-American, has produced strong evidence of "circumstances giving rise to an inference of unlawful discrimination." *Brown*, 159 F.3d at 102; *Carter*, 33 F.3d at 458. Accordingly, Saulsberry has clearly demonstrated all four elements of her *prima facie* case, and one that is certainly strong. *See Sears*, 243 F.3d at 851–52 (holding that a plaintiff demonstrated a strong *prima facie* case).

SRR's problematic objections to Saulsberry's *prima facie* case are woefully misguided and seek to improperly raise the burden of Saulsberry's *prima facie* case. (ECF No. 73 at 2–10.) Rather than focusing upon the four elements that Saulsberry must demonstrate in her *prima facie* case,

SRR emphasizes that the Magistrate Judge erred in making factual findings, interpreting Section 3161, and maintains that it did not act in a discriminatory manner. (*See id.*) Besides bringing arguments relating to pretext, at no point does SRR identify any element of the *prima facie* case that Saulsberry has failed to satisfy, but focuses upon whether its various actions are actually discriminatory and unlawful. (*See id.*) It seems that SRR is making a veiled attempt to conflate and heighten the inquiry pertaining to a claimant's *prima facie* case, which only raises an inference of discrimination, and one concerning pretext, which is chiefly concerned with answering the ultimate question of intentional discrimination. (*See* ECF No. 73 at 5–17) The Fourth Circuit has routinely emphasized that the burden of establishing a *prima facie* case "is not a heavy one" and is a "relatively easy test." *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984). This is so because the *prima facie* case only raises *an inference of discrimination* on the part of an employer. *See Diamond*, 416 F.3d at 318. The pretext inquiry, on the other hand, is chiefly concerned with showing whether an adverse employment action is indicative of *deliberate*, *intentional discrimination*. *See Dennis*, 290 F.3d at 646 (noting that a claimant can "attempt to establish that she was the victim of intentional discrimination by 'showing that the employer's proffered explanation is unworthy of credence.'" (quoting *Burdine*, U.S. at 256)). As just explained, Saulsberry has satisfied this "relatively easy test." *Young*, 748 F.2d at 197. SRR's contentions about its actions and obligations under Section 3161, as well as its alleged, courtesy calls to Section 3161 applicants, is best left to the pretext inquiry where the ultimate question of intentional discrimination arises. *See Dennis*, 290 F.3d at 646. SRR's objections must be overruled as it relates to Saulsberry's *prima faci*e case as they seek to heighten Saulsberry's modest burden at this stage of *McDonnell Douglas*' burden-shifting framework. *See Young*, 748 F.2d at 197.

The court's inquiry does not end at Saulsberry's *prima facie* case. *See Holland*, 487 F.3d

at 214. Upon a successful showing of a *prima facie* case, an employer then bears the burden of showing a legitimate, nondiscriminatory reason for its adverse employment action. *Burdine*, 450 U.S. at 254–55. At this juncture, SRR only bears a burden of production, not persuasion, and the court is precluded from making a credibility assessment. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Reeves*, 530 U.S. at 142). To show a legitimate, nondiscriminatory reason, SRR must proffer a reason for not hiring Saulsberry. *See Sears*, 243 F.3d at 852. Here, SRR contends that it did not hire Saulsberry because other applicants performed better than her during the interview process on August 21, 2014, and she had the lowest interview score of all the applicants on that day. (ECF No. 45-1 at 31.) Interestingly, in further framing its legitimate, nondiscriminatory reason, SRR emphasizes that the ultimate selection was "based on the candidates' performance <u>during</u> the interview process–not what they did <u>before</u> the interview process." (ECF No. 73 at 10 (emphasis in original) (citation omitted).) SRR produced the results from the interview process, and they explicitly reveal that Saulsberry had the lowest interview score on the interview day and also provide detailed notes from the entire interview panel concerning her performance. (*See* ECF No. 45-1 at 31; ECF No. 61-62 at 36; ECF No. 61-59 at 26.) The notes, from each respective panel member, indicates his or her reasoning for scoring each applicant, including Saulsberry, in a certain way. (*See* ECF No. 61-62 at 89–147.) There is also deposition testimony supporting this reason proffered by SRR. (*See id.* at 37.) By providing the actual results of the interview process, the notes therefrom, and deposition testimony, SRR has sufficiently carried its burden of production as it relates to supplying a legitimate, nondiscriminatory reason for not hiring Saulsberry, which is her low interview score for the 2014

FLM position.[8] *See Hannah P. v. Coats*, 916 F.3d 327, 342–43 (4th Cir. 2019) (accepting an employer's legitimate, nondiscriminatory reason, in the failure-to-hire context, when it presented evidence that an employee possessed "perpetual issues with attendance, timeliness, and reporting absences to her superiors"); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007) ("An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection. Such a reason will satisfy the employer's burden of production, however, only if the employer articulates a clear and reasonably specific basis for its subjective assessment." (citations omitted)); *Williams v. Henderson*, 129 F. App'x 806, 814–15 (4th Cir. 2005) (finding that the United States Postal Service provided a legitimate reason, thereby satisfying its burden of production, for not hiring an African-American applicant because "the white employee performed better during his interview"); *Malghan v. Evans*, 118 F. App'x 731, 732 (4th Cir. 2004) (finding that a federal employer provided a legitimate, nondiscriminatory reason when the prevailing candidate's score exceeded the plaintiff's score); *Holdcraft v. Cty. of Fairfax*, 31 F. App'x 97, 98 (4th Cir. 2002) ("[D]eposition testimony and supporting documentation established that the County relied on rank-ordering of candidates by a review panel, based on objective reviews of documentation and subjective interviews during which all

---

[8] The court observes that the Fourth Circuit has not yet, within a controlling, published opinion, opined on the extent to which the results of subjective interviews may validly serve as a legitimate, nondiscriminatory reason on the part of an employer. *See Williams v. Henderson*, 129 F. App'x 806, 814–15 (4th Cir. 2005); *Malghan v. Evans*, 118 F. App'x 731, 732 (4th Cir. 2004); *Holdcraft v. Cty. of Fairfax*, 31 F. App'x 97, 98 (4th Cir. 2002). However, the United States Court of Appeals of the Eleventh Circuit and the United States Court of Appeals for the Fifth Circuit indicate that the absence of a "specific" basis for an interview assessment–which would presumably exist when there is a lack of evidence showing how the subjective results were reached–is insufficient for an employer to claim that the subjective results were a legitimate, nondiscriminatory reason. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007); *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000)

candidates were presented with the same questions and rated individually on their answers."); *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."); *Thompson v. Bridgeton Bd. of Educ.*, 9 F. Supp. 3d 446, 455 (D.N.J. 2014) ("Poor performance in an interview is recognized as a legitimate[,] nondiscriminatory reason for failure to hire or promote." (citations omitted)).

Lastly, the court must determine whether SRR's failure to hire Saulsberry is pretextual, the primary issue that is vigorously disputed between the parties. (*Compare* ECF No. 73, *with* ECF No. 76.) Saulsberry can show pretext if SRR's legitimate, nondiscriminatory reason is "inconsistent over time, false, or based on mistakes of fact." *Haynes*, 922 F.3d at 225 (citation omitted). Even if Saulsberry provides evidence of pretext, the court is mindful that intentional discrimination remains the ultimate inquiry. *See Reeves*, 530 U.S. at 146–47. Again, in *Reeves*, the Supreme Court explained that "a plaintiff's *prima facie* case, *combined with sufficient evidence to find that the employer's asserted justification is false*, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148 (emphasis added). Accordingly, Saulsberry, or any employee for that matter, "need not submit additional evidence of discrimination unless 'no rational factfinder could conclude that the action was discriminatory.'" *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258–59 (4th Cir. 2001). To recount, SRR's legitimate, nondiscriminatory reason for not hiring Saulsberry is premised upon her poor score from the interview process and the interview process being the *sole means* for hiring the successful candidates, meaning that circumstances outside of the interview process were irrelevant. (*See* ECF No. 45-1 at 31; ECF No. 73 at 10.) In the instant case, Saulsberry has shown that SRR's legitimate, nondiscriminatory reason is "based on mistakes of fact." *Haynes*, 922 F.3d at 225 (citation

omitted). Saulsberry first points to the deposition testimony of Cindy Head to show that outside circumstances were relevant in the hiring process, and not just the results of the interview scores. (ECF No. 76 at 10 (citing ECF No. 61-62 at 37).) In opining about how Robert Hicks was the "strongest candidate" on the interview day, Cindy Head explicitly testified that Robert Hicks "had *formally been* a multiskilled technician, so he had a *maintenance background* as well as *radiological background . . . .*" (ECF No. 61-62 at 37.) She found his background qualities "significant." (*Id.*) Cindy Head's own statements recognize that the strength of Robert Hicks' candidacy was not only based upon his final interview score, but *was also* indicative of his "background," which necessarily steps outside the purview of the interview process on that day and considers an applicant's *prior experiences*. (*See id.*) With this fact, Saulsberry has demonstrated a robust showing of pretext because she has directly rebutted SRR's legitimate, nondiscriminatory reason by revealing that SRR's reason is no more than a "mistake[] of fact" directly contradicted by the record and its own officials. *Haynes*, 922 F.3d at 225 (citation omitted).

However, beyond the significant concessions by Cindy Head, which undermines SRR's legitimate, nondiscriminatory reason, Saulsberry provides additional evidence that SRR's proffered reason is pretextual, thereby showing that a reasonable factfinder could find in her favor regarding the pretext inquiry and ultimate question of discrimination. (*See* ECF No. 76 at 10–13.) Saulsberry provides the Panel Review Summary Rating Form, which explicitly states that Joseph Butler had an "impressive *experience base*," while Robert Hicks' "[s]kill set includes *prior SRR experience* in RP and [m]aintenance . . . ." (ECF No. 61-30 at 1 (emphasis added).) As it concerns Saulsberry, the panel noted that she possessed "*experience as an RP FLM*, but demonstrates obvious weakness in leadership and soft skills that would require significant management oversight." (*Id.*) SRR's Panel Review Summary Rating Form contemplates that the panel members

were influenced by an applicant's prior job experiences–past experiences which necessarily occurred before the interview day–and did not rely solely upon the interview performance of applicants. (*See id.*) This document further demonstrates that SRR's reason for not hiring Saulsberry is "unworthy of credence" because, in stark contrast to SRR's proffered reason, it also shows that SRR and its interview panel were not solely focused upon the interview scores or results, but were impacted by the former positions and experiences of the applicants. *Burdine*, 450 U.S. at 256 (citation omitted). Moreover, SRR's legitimate, nondiscriminatory reason is simply at variance with Saulsberry's proffered evidence and is more akin to a "post hoc rationalization[] invented for the purposes of litigation" because panel members plainly noted that past job positions were relevant to the interview process, and the interview panel never confined themselves to the narrow performance of interviewees on that day as SRR avers. *See Jacobs*, 780 F.3d at 576 (citation omitted). In sum, based upon the concessions by Cindy Head and the express language in the SRR's Panel Review Summary Rating Form, which are both extremely probative of pretext, there is "ample evidence from which a factfinder could conclude that" SRR's "asserted justification is false." *See Sears*, 243 F.3d at 852–53 (quoting *Reeves*, 530 U.S. at 148). *See also Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race." (emphasis in original)).

While the aforementioned evidence is not only sufficient and probative to rebut SRR's legitimate, nondiscriminatory reason, Saulsberry presents additional evidence that is extremely relevant to the ultimate inquiry of intentional discrimination and whether her race was a "motivating factor" in SRR's hiring decision. *See* 42 U.S.C. § 2000e-2(m); *Desert Palace, Inc.*,

539 U.S. at 92–93; *Reeves*, 530 U.S. at 146–47; *Sears*, 243 F.3d at 854–55. First, Saulsberry vigorously contends that she was not given a hiring preference under Section 3161, while SRR contends it did not need to apply the preference because the preference only applies when a preferential applicant is "approximately equal" with another candidate. (*Compare* ECF No. 73 at 13–16, *with* ECF No. 76 at 12–13.) At bottom, the parties essentially have different interpretations of Section 3161. (*Compare* ECF No. 73 at 13–16, *with* ECF No. 76 at 12–13.) Regardless of the appropriate interpretation of Section 3161 and without making a determination regarding the construction of Section 3161, viewing the facts in the light most favorable to Saulsberry and drawing rational inferences in her favor, there are issues with SRR's *application* of Section 3161 to other candidates. *See Merritt*, 601 F.3d at 299. As it relates to the 2014 FLM position, Gayl Hoel identified Saulsberry, who is African-American, as eligible for a hiring preference for the position. (*See* ECF No. 61-26 at 1.) Robert Hicks, a white male, is not identified as eligible for the hiring preference for the 2014 FLM position, leading to a rational inference that he was ineligible. (*See* ECF No. 61-26 at 1; ECF No. 61-21 at 3.) However, despite his ineligibility, DOE identifies that Robert Hicks was provided with Section 3161's hiring preference. (*Id.*) This discrepancy suggests that SRR engaged in a "selective application" of its own neutral policies, and a reasonable trier of fact could also use this evidence as probative of intentional discrimination because an African-American applicant, one who affirmatively held the Section 3161 preference, received no benefit from it when compared to a white applicant, one who was never entitled to it, thereby demonstrating the "selective application" of a neutral policy. *See Merritt*, 601 F.3d at 299. Secondly, although SRR maintains that it never had an affirmative obligation to contact Saulsberry about open positions, regardless, there is evidence showing that courtesy calls were made at certain points, and Saulsberry maintains she never received one. (*See* ECF No. 45-9 at 6–7; ECF No. 61-

3 at 2; ECF No. 73 at 3–6.) Accordingly, there is a "genuine dispute of material fact" concerning the disconnect between Saulsberry's contention that she never received a courtesy call, and Gayl Hoel's deposition testimony that she indeed undertook courtesy calls, but she cannot remember who she called. (*Compare* ECF No. 45-9 at 6–7, *and* ECF No. 61-21 at 3, *with* ECF No. 73 at 3–6.) As such, whether the actual courtesy call process was executed in a discriminatory manner should be decided by a jury, and not the court, especially because SRR has, apparently, not retained any records of who was called (ECF No. 45-9 at 6–7). *See Celotex Corp.*, 477 U.S. at 322 (citation omitted).

Third, when first initiating the application process for the 2014 FLM position, individuals within SRR considered there to be "sensitivity surrounding" Saulsberry's application. (ECF No. 61-49 at 1.) Continuing to view the evidence in the light most favorable to Saulsberry and drawing *rational inferences* in her favor, as this statement may or may not have a relationship to discrimination, SRR should further develop this fact or provide an explanation about it during a trial because *there are currently no justifications about the statement during this stage of the proceedings*, and *it likely involves a credibility determination for a jury. See Harrison v. S.C. Dep't of Mental Health*, 641 F. App'x 202, 207 (4th Cir. 2015) (holding that a federal district court prematurely granted summary judgment on a retaliation claim when a legal issue could not "be decided as a matter of law without further factual development"); *Dennis*, 290 F.3d at 650 (holding that it was improper to grant judgment as a matter of law, in a gender discrimination case, when there were "possible alternatives" regarding an explanation made by one of the employer's officers, and it was necessary for a jury to weigh the credibility of the witness). Lastly, as forcefully mentioned by Saulsberry's counsel during the court's hearing on this matter, on June 21, 2014, James Wilson, who was John Gall and Saulsberry's superior (ECF No. 61-60 at 2–3) and

unquestionably played a role in the hiring process (ECF No. 61-60 at 20), forwarded an e-mail to individuals within SRR, including Cindy Head and Charles Sanders, notifying them of Saulsberry's candidacy by simply stating "FYI" and indicating that he could either "consider" or "unconsider" Saulsberry.[9] (*See* ECF No. 61-47.) Cindy Head and Charles Sanders, two white individuals who interviewed Saulsberry were included on this e-mail, however, Charles Lampley, an African-American who interviewed Saulsberry, was not included on this e-mail forwarded by James Wilson. (*See* ECF Nos. 61-47, 61-62.) This is an additional fact which SRR must explain at trial because it likely depends *upon a credibility assessment of why* James Wilson took this course of conduct, which includes excluding Charles Lampley, the only African-American on the interview panel, from the e-mail and making him aware of Saulsberry's candidacy, and the court is precluded from making such a credibility judgment. *See Dennis*, 290 F.3d at 648–50. Moreover, the e-mail suggests that Saulsberry's hiring preference was irrelevant to the hiring decision, but somehow relevant to Robert Hicks when he was not even eligible for it. (*See* ECF Nos. 61-21, 61-

---

[9] During the hearing, counsel for SRR, on privilege grounds, urged the court to strike the James Wilson's e-mail mentioning Saulsberry. However, there is no indication that the e-mail is protected by the attorney-client privilege because the e-mail does not involve any communications between SRR's legal counsel and its employees (ECF No. 61-47). *See In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir. 2003) (affirming prior circuit precedent that the attorney-client privilege only applies when a communication is made to an attorney, or his subordinate, from a client). Additionally, there is no indication that the e-mail is protected by the work-product doctrine because it was not prepared for the purposes of litigation by an attorney, but instead created during the course of SRR's hiring process (ECF No. 61-47). *See Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011) ("'[M]aterials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes' do not constitute 'documents prepared in anticipation of litigation' protected by work[-]product privilege." (quoting *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992))). Lastly, even assuming that the e-mail was actually privileged, SRR has waived any such privilege because the e-mail was contained as an exhibit to Saulsberry's Response in Opposition (ECF No. 61-47), and the Magistrate Judge's Report explicitly references this e-mail (ECF No. 68 at 11), and SRR never objected to either Saulsberry or the Magistrate Judge's initial consideration and use of the e-mail. *See In re Grand Jury Subpoena*, 341 F.3d at 336; *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998).

26, 61-47.) The court is also aware that James Wilson's credibility is at issue because he stated that he was not the hiring manager, but he played a role in the hiring process, an e-mail designates him as the hiring manager, and SRR, presumably conceding the issue, now indicates that he was the hiring manager. (*See* ECF No. 61-26 at 1; ECF No. 61-51 at 1; ECF No. 61-60 at 20; ECF No. 73 at 8.) Such a credibility issue is the sole province of the jury. *See generally Shaw v. Stroud*, 13 F.3d 791, 804 (4th Cir. 1994) ("[T]he credibility of a deposition is a question for the jury rather than an issue to be settled at the summary judgment stage." (citing *Summerlin v. Edgar*, 809 F.2d 1034, 1039 (4th Cir. 1987)). Under the totality of all of these additional circumstances, which build upon Saulsberry's successful rebuttal of SRR's legitimate, nondiscriminatory reason, Saulsberry has offered "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Williams*, 809 F.3d at 109 (quoting *Anderson*, 477 U.S. at 256). Saulsberry has also identified genuine credibility determinations that must be made for numerous witnesses (ECF No. 61 at 23; ECF No. 68 at 11; ECF No. 76 at 11), in which the court is foreclosed from taking part. *See Shaw*, 13 F.3d at 804. Thus, Saulsberry's "*prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, *may permit* the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148 (emphasis added).

For these reasons, taken together, the Magistrate Judge's Report did not err in determining that Saulsberry has demonstrated a *prima facie* case, pretext, and possible discrimination regarding her interest in the 2014 FLM position. SRR unduly focuses upon what Saulsberry *has not* shown in her case, but perhaps SRR should consider what Saulsberry *has* shown. *See Williams*, 809 F.3d at 109 ("[T]he nonmoving party nonetheless must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor.'" (alteration in original)). Indeed, as stated quite eloquently by then-Judge Davis, "we should not examine the trees so minutely that we

lose sight of the forest," which he stated to convey that the central question in employment discrimination cases always remains "whether the plaintiff has generated a genuine dispute of material fact that she is the victim of intentional discrimination, notwithstanding facially plausible reasons offered by the employer for its adverse employment action." *Merritt*, 601 F.3d at 302 (Davis, J., concurring). Accordingly, the court accepts the Magistrate Judge's Report as it relates to its ultimate conclusion, denies SRR's Motion pertaining to Saulsberry's disparate treatment claim for the 2014 FLM position, and overrules SRR's objections.

### ii. *Saulsberry's Retaliation Claim*

Title VII also makes the following conduct unlawful on the part of employers:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Essentially, this provision within Title VII prohibits employers from retaliating against an employee when he or she has opposed an unlawful employment practice, filed a charge with an investigative body, or participated in proceedings before the EEOC. *See Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018). When claimants lack direct evidence of retaliatory discrimination, they may proceed under the *McDonnell Douglas* framework in order to establish a *prima face* case. *See Foster*, 787 F.3d at 250. When using the *McDonnell Douglas* framework in this context, a plaintiff must first show that he or she (1) "engaged in protected activity"; (2) "suffered an adverse employment action"; and (3) demonstrate a "causal connection between the protected activity and the adverse action." *Ray*, 909 F.3d at 669. *See also Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2009) (citation omitted). "[T]he burden for establishing causation at the prima facie stage is 'less onerous.'" *Foster*, 787 F.3d at 251 (quoting *Williams v.*

*Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). To establish causation at the *prima facie* stage of a retaliation case, the employee must simply show "that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers v. City of Laurel*, 895 F.3d 317, 335–36 (4th Cir. 2018) (citations omitted). *See also Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) ("[C]lose temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation." (citations omitted)).

"After the *prima facie* showing is made, '[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non[]retaliatory reason.'" *Strothers*, 895 F.3d at 328 (quoting *Foster*, 787 F.3d at 250). If the employer successfully makes his or her showing, "the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were pretext for discrimination.'" *Foster*, 787 F.3d at 250 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). At the pretext stage, an employer must first "act out of 'the desire to retaliate.'" *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900-01 (4th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). Next, "a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster*, 787 F.3d at 252 (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). In other words, at this stage, a claimant must establish that "the harm would not have occurred in the absence of-that is, but for-the defendant's

conduct."[10] *Id.* (quoting *Nassar*, 570 U.S. at 346–47). This method assists a plaintiff in "prov[ing] that retaliation was the actual reason for the challenged employment action . . . ." *Id.*

Despite SRR's arguments to the contrary, Saulsberry has successfully demonstrated a *prima facie* case of retaliation concerning her rejection from the 2014 FLM position. *See Ray*, 909 F.3d at 669. First, a protected activity, for purposes of retaliation, includes, but is not limited to: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). Moreover, protected activity includes "complaining to superiors about suspected violations of Title VII." *Strothers*, 895 F.3d at 328 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015)). Here, Saulsberry first filed an internal complaint with SRR on September 17, 2013, which is sufficient to count as a protected activity under Title VII. *See DeMasters v. Carilion Clinc*, 796 F.3d 409, 417 (4th Cir. 2015) ("This Circuit, as well as the other Courts of Appeals, also has articulated an *expansive view* of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinion in order to bring attention to an employer's discriminatory activities.'" (emphasis added) (citations omitted) (quoting *Laughlin*, 149 F.3d at 259)). Subsequently, Saulsberry filed a charge with the EEOC on April 7, 2014, which is statutorily sufficient to serve as a protected activity under Title VII, and the primary protected activity at issue. *See* 42 U.S.C. § 2000e-3(a). Second, Saulsberry

---

[10] The court observes that cases from the Fourth Circuit are not in agreement regarding how high or low the but-for causation requirement may or may not be. *Compare Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) ("This but-for causation requirement is stricter than the 'lessened causation standard' for discrimination claims . . . ." (internal citation omitted)), *with Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) ("*Nassar*'s but-for causation standard is not the 'heightened causation standard' described by the district court . . . ." (citation omitted)).

claims that she "suffered an adverse employment action" when she was not hired for the 2014 FLM position in August 2014 (ECF No. 61-62 at 36; ECF No. 61-59 at 26). *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer—to fail or refuse to hire . . . any individual with respect to his compensation, terms, conditions, or privileges of employer, because of such individual's race . . . ."). The first two elements of Saulsberry's *prima facie* case are clearly established. *See Ray*, 909 F.3d at 669.

Lastly, Saulsberry must satisfy her "less onerous" burden of *prima facie* causation, which is accomplished by showing: "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 335–36 (citations omitted); *Foster*, 787 F.3d at 251 (citation omitted). In the instant case, Saulsberry has shown that SRR "understood" her engagement in a protected activity because she first filed an internal complaint with SRR, contesting her inclusion in the WFR, which she alleged was both unlawful discrimination and retaliation, and the results therefrom concluded that her inclusion was not discriminatory. (*See* ECF No. 45-2 at 44; ECF No. 61-10 at 1–3; ECF No. 61-58 at 11–12.) Indeed, the affirmative act of investigating Saulsberry's internal grievance is indicative of SRR's "underst[anding]" of Saulsberry's protected activity. (*See* ECF No. 45-1 at 10; ECF No. 45-14 at 8–9.) Moreover, when responding to another charge filed by Saulsberry, SRR expressly acknowledged Saulsberry's claim that was filed with the EEOC on April 7, 2014. (*See* ECF No. 61-5 at 2.) Turning to the temporal proximity of SRR's awareness of Saulsberry's protected activity and the adverse action, Saulsberry filed a charge with the EEOC in April 2014 and was subsequently interviewed by SRR in August 2014, meaning that approximately four months elapsed between the filing of her protected activity and the eventual adverse action. (*Compare*

ECF No. 45-2 at 129, *with* ECF No. 61-62 at 17.) Generally, temporal proximity at this stage "must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citations omitted). To date, the Fourth Circuit has held that two-and-a-half and one month gaps are sufficiently narrow to satisfy causation for a claimant's *prima facie* case. *See Foster*, 787 F.3d at 253; *King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003). The Fourth Circuit has also found a causal nexus, at the *prima facie* stage, when an administrative complaint was filed approximately four months before the adverse employment action. *See Williams*, 871 F.2d at 454, 457. Because Saulsberry's claim was filed four months before she was rejected by means of the interview, there is a sufficient causal connection under Fourth Circuit precedent. *See id. See also Carter*, 33 F.3d at 460. Even if four months is considered insufficient to demonstrate a temporal proximity, for retaliation claims in the failure-to-hire realm, the Fourth Circuit has also held that causation for the *prima facie* case is established when an employer "at the first available opportunity" declines to hire an employee that it knows engaged in a protected activity. *See Price*, 380 F.3d at 213. In this case, a reasonable fact finder could find that, not only did SRR have knowledge of Saulsberry's protected activity, but that it, "at the first available opportunity," decided to retaliate against Saulsberry by refusing to hire her when she decided to apply for a job in August 2014. *Id.* The evidence shows that Saulsberry maintained communications with SRR's employees between April 2014 and August 2014, particularly in June and July. (ECF No. 61-25 at 1; ECF No. 61-32 at 1–2.) Indeed, SRR's "first available opportunity" to retaliate against Saulsberry–as she was no longer employed at its facilities–was in August 2014, when she interviewed for the 2014 FLM position, because that date is *after* the filing of her EEOC complaint in April 2014. *See Thurston v. Am. Press, LLC*, 497 F. Supp. 2d 778, 781–85 (W.D. Va. 2007) (discussing the novel inquiry of retaliatory causation in the failure-to-hire context and holding that there was sufficient causation

at the *prima facie* stage when an employee filed an application with his previous employer *four years after he filed an EEOC charge against the same employer* because it was the employer's "first available opportunity" to retaliate against the former employee (citations omitted)). For these reasons, Saulsberry has shown causation for her *prima facie* case, both by temporal proximity and this being the "first available opportunity" for SRR to retaliate. *See Price*, 380 F.3d at 213. As such, Saulsberry has sufficiently established a *prima facie* case of retaliation, which the court reiterates is, and should be, a "relatively easy test." *Young*, 748 F.2d at 197.

Because Saulsberry has successfully demonstrated a *prima facie* case for retaliation, the burden of production shifts to SRR to show that it failed to hire Saulsberry for a legitimate, nonretaliatory reason. *See Strothers*, 895 F.3d at 328 (quoting *Foster*, 787 F.3d at 250). Like its proffered reason for Saulsberry's status-based discrimination claim, SRR claims that it declined to hire Saulsberry because "she was not judged to be the best candidate by the members of the interview panel." (ECF No. 45-1 at 35.) As already decided by the court, SRR has carried its burden of production as it relates to this legitimate, nonretaliatory reason, which causes the burden of production to shift back to Saulsberry, and she must prove SRR's reason is pretextual. *See* Part III.B.i.

To show pretext, Saulsberry "must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster*, 787 F.3d at 252. To show that SRR engaged in retaliation and that it was the "real reason" of her harm, Saulsberry is required to prove that SRR's "*desire to retaliate* was the *but-for cause* of the challenged employment action." *Nassar*, 570 U.S. at 352 (emphasis added). As already decided by the court concerning Saulsberry's intentional discrimination claim, which involved the same legitimate, nondiscriminatory reason currently provided by SRR, Saulsberry has satisfied her burden of

35

production to show that SRR's reason is false because it was "based on mistakes of fact" about how the applicants' past experiences were impactful on the overall interview and selection process. *See supra* Part III.B.i. For example, Saulsberry provides evidence that the interviewers considered the prior experiences of applicants, which has created a genuine dispute of material fact concerning the pretextual nature of SRR's legitimate, nondiscriminatory reason. *See id.* Nevertheless, Saulsberry must still demonstrate that unlawful retaliation was the "real reason" for the adverse employment action by satisfying the but-for causation standard. *Foster*, 787 F.3d at 252. But-for causation "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). *See also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218 (4th Cir. 2016) (citing *Foster*, 787 F.3d at 252). Applying those legal principles here, Saulsberry filed her charge with the EEOC in April 7, 2014. (ECF No. 45-2 at 129.) On May 22, 2014, a little more than a month after her EEOC filing, Erin Stringfellow, a recruiter for the parent company of SRR, sent an e-mail to James Wilson regarding Saulsberry's initial application for the 2014 FLM position and mentioned that there was "sensitivity surrounding" Saulsberry's situation. (ECF No. 61-49 at 1.) This is the same James Wilson (ECF No. 61-49 at 1) whose credibility is already at issue regarding his true role in the hiring process. *See supra* Part III.B.i. Interestingly, James Wilson affirmatively admits that he was not aware of any of the other applicants for the 2014 FLM position, besides Saulsberry, having internal grievances pending when he selected resumes for consideration. (*See* ECF No. 61-60 at 21.) Moreover, Cindy Head, who was a panel interviewer of Saulsberry, testified in her deposition that she "knew something was going on" in regard to a possible EEOC complaint lodged by Saulsberry, but later indicated that she was not aware of "*any complaints*" brought by Saulsberry. (*See* ECF

No. 61-62 at 25, 33 (emphasis added).) The credibility of Cindy Head's opinions is likewise at issue because some of Saulsberry's proffered evidence demonstrates that Cindy previously participated in the investigation of one of Saulsberry's internal complaints concerning her inclusion within the WFR, thereby making a credibility dispute concerning her testimony. (*Compare* ECF No. 61-14 at 3, *with* ECF No. 61-62 at 33.) The court is constrained from usurping the function of a jury by making a credibility determination in regard to either James Wilson and Cindy. *See Shaw*, 13 F.3d at 804.

In this case, Saulsberry has presented evidence, by a preponderance, demonstrating that SRR's legitimate, nondiscriminatory reason is pretext. *See supra* Part III.B.i. This evidence, which is applicable to the *same reason offered by SRR for both claims*, is permissible circumstantial evidence requiring this case to "be decided by a trier of fact[,] and [it] cannot be resolved on summary judgment." *Haynes*, 922 F.3d at 225. Moreover, the credibility issues of James Wilson and Cindy Head also preclude this court from granting summary judgment as to Saulsberry's retaliation claim. *See Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) ("Summary judgment also is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor. (citing *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979))). As such, similar to the reasons for denying SRR's Motion as to Saulsberry's status-based discrimination claims, the court must also deny its Motion as to Saulsberry's retaliation claim. *See* Part III.B.i. Accordingly, the court overrules SRR's objections relating to Saulsberry's retaliation claim and accepts the Magistrate Judge's Report. *See id.*

## C. Claims Regarding Available, Future Positions

Pursuant to Title VII, Saulsberry's Complaint indicates that she alleged claims premised

upon intentional discrimination and retaliation involving future FLM positions for which she did not apply. (ECF No. 1 at 19 ¶ 143, 20 ¶¶ 153–54.) The parties expressly agree that Saulsberry alleged such claims against SRR. (*See* ECF Nos. 73, 74.) SRR's Motion for Summary Judgment sought judgment "*as to all* of Plaintiff Adrienne Saulsberry's claims . . . ." (ECF No. 45 at 1.) The Magistrate Judge's Report concluded that Saulsberry abandoned her claims concerning future FLM positions, available after 2014, for which she did not apply because she "ma[de] no argument in opposition to [] [SRR's] [S]ummary [J]udgment [M]otion regarding [these] claims . . . ." (ECF No. 68 at 6 n.2.) Saulsberry specifically objects to this finding within the Report because SRR failed to move for summary judgment as to those claims, and she noted that she specifically observed that SRR "[did] not move[] for [s]ummary [j]udgment on [that] claim" in her Opposition to Defendant's Motion for Summary Judgment. (ECF No. 74 at 5–6 (quoting ECF No. 61 at 36 n.4).)

As a general legal matter, a party moving for summary judgment bears responsibility for showing the bases of summary judgment. *See Celotex Corp.*, 477 U.S. at 323 ("Of course, a party seeking summary judgment *always bears the initial responsibility* of informing the district court of the basis for its motion . . . ." (emphasis added)). Here, SRR carefully briefed Saulsberry's claims regarding her termination by means of the WFR and those concerning the 2014 FLM position. (*See* ECF No. 45-1 at 13–36.) However, SRR, the moving party, never briefed Saulsberry's claims relating to future FLM positions for which she did not apply within its Motion for Summary Judgment. (*See id.*) Such an omission is insufficient to satisfy its "initial responsibility" for guiding the court at this stage of the proceedings. *See Celotex Corp.*, 477 U.S. at 323. Based upon the filings and the record, there is no indication that Saulsberry abandoned those claims, and, in fact, she affirmatively mentioned that SRR failed to brief those claims within

its Motion. (ECF No. 61 at 36 n.4.) Because SRR has failed to challenge Saulsberry's claims regarding future FLM positions, and the matter has not been directly briefed, these claims do not warrant the entry of summary judgment. *See generally Walker v. DDR Corp.*, C/A No. 3:17-cv-01586-JMC, 2019 WL 1434229, at *7 (D.S.C. Mar. 29, 2019) ("Because Defendants have failed to challenge Plaintiff's claim for negligent hiring, training, supervision, and retention[,] and the matter has not been directly briefed, this claim does not warrant the entry of summary judgment." (citations omitted)); *Viacom Int'l Inc. v. IJR Capital Invs., LLC*, 242 F. Supp. 3d 563, 575–76 (S.D. Tex. 2017) ("Further, Viacom did not brief these [remaining] claims in its motion. Because these claims were not briefed in the motion, the court need not address them at this time." (citations omitted)); *McCollough v. Minn. Lawyers Mut. Ins. Co.*, C/A No. CV 09–95–BLG–RFC–CSO, 2013 WL 823411, at *9–10 (D. Mont. Mar. 6, 2013) (holding that a party "failed to meet its initial burden under Rule 56" when it did not address one of the opposing party's claims); *Donovan v. Bishop*, C/A No. 1:09–cv–275–WTL–TAB, 2010 WL 4062370, at *3 (S.D. Ind. Oct. 14, 2010) ("Although the Defendant purportedly moved for summary judgment on all of Donovan's claims, his brief does not discuss Count II. . . . This is not enough to justify granting summary judgment in his favor.").

For those reasons, Saulsberry's objections to the Report about these claims are sustained. Accordingly, the court rejects the Report's finding in this regard, and these claims may proceed to trial. *See Walker*, 2019 WL 1434229, at *7. Therefore, SRR's Motion is denied as to future positions for which Saulsberry did not apply. *Id.*

## IV. CONCLUSION

After careful consideration of SRR's Motion for Summary Judgment, the Magistrate Judge's Report, both parties' objections to the Magistrate Judge's Report, and the parties'

arguments at the hearing, the court **ACCEPTS IN PART** and **REJECTS IN PART** the Magistrate Judge's Report. Accordingly, the court **GRANTS IN PART** and **DENIES IN PART** SRR's Motion for Summary Judgment (ECF No. 45). Specifically, the court **GRANTS** SRR's Motion as to Saulsberry's claims based upon her termination in SRR's 2013 Workforce Reduction ("WFR"), but **DENIES** SRR's Motion concerning Saulsberry's Title VII and § 1981 disparate treatment claims based upon (1) intentional race discrimination in failing to hire her for the 2014 First Line Manager ("FLM") position; (2) retaliation, taking the form of her rejection from the 2014 FLM position, for filing a charge with the Equal Employment Opportunity Commission ("EEOC") in April 2014 and an internal grievance beforehand; and (3) a failure to hire her for any positions for which she did not apply.

       **IT IS SO ORDERED.**

                                   *J. Michelle Childs*

                                  United States District Judge

August 7, 2019
Columbia, South Carolina