# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### AIKEN DIVISION

| | | |
|---|---|---|
| Adrienne W. Saulsberry, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:16-cv-02792-JMC |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Savannah River Remediation, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. FACTUAL BACKGROUND

Plaintiff Adrienne Saulsberry ("Saulsberry") sued Defendant Savannah River Remediation, LLC ("SRR") for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981. On September 27, 2019, after a five-day jury trial, the jury returned a verdict in favor of Saulsberry on her Title VII and § 1981 retaliation claims. Specifically, the jury found, by a preponderance of the evidence, that after having been separated from SRR in its Reduction in Force ("RIF"), Saulsberry was not re-hired for any of the First Line Manager positions in 2014 and 2015 on account of retaliation for engaging in protected activity. Conversely, the jury found that SRR did not discriminate against Saulsberry based on her race under Title VII and § 1981.

At the trial's conclusion, the jury awarded Saulsberry fifty-five thousand dollars ($55,000.00) in compensatory damages[1], four hundred twenty thousand dollars ($420,000.00) in

---

[1]The court acknowledges that if an employee prevails on her Title VII employment discrimination case, a cap will apply on the amount of damages that the jury can award. Under Title VII, the most that an individual employee can receive for compensatory damages (to compensate for emotional

back pay, and one million four hundred seventy-five dollars ($1,475,000.00) in punitive damages, plus post-judgment interest at the rate of 1.86%. (ECF No. 126.)

The matter before the court is a review of Saulsberry's Motion for Equitable Relief (ECF No. 136). Saulsberry's Motion was filed on October 25, 2019, and SRR responded in opposition on November 8, 2019 (ECF No. 139). Upon review of the parties' presentations at trial and the parties' post-trial briefing, and for the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** Saulsberry's Motion for Equitable Relief (ECF No. 136). With these matters decided, final judgment shall be entered in favor of Saulsberry.

## II. DISCUSSION

A.     The Parties' Arguments

In her Motion for Equitable Relief, Saulsberry moves the court to grant the following relief:

> 1.  An award of pre-judgment interest in the amount of $55,118.00 on the back-pay award of $420,000.00, from 2014 to September of 2019 and calculated at an 8.75% interest rate compounded annually;
>
> 2. Payment by SRR, to include an amount of money to offset the negative tax implications on her lump sum back pay award in the amount of $203,113.00;
>
> 3. An order finding that reinstatement is impractical and a front pay award from the time of trial to the time that she would have reached her normal retirement date at SRR in 2035, in the amount of $642,384.00 and $102,159.00 for the difference in retirement, plus post judgment interest that is applicable at the time;

---

distress and out-of-pocket expenses for medical treatment) and punitive damages (designed to punish an employer for particularly malicious or reckless discrimination) is $300,000. Other forms of monetary damages, including back pay and front pay, are also available under Title VII and are not subject to a cap. By contrast, no cap on monetary damages exists under 42 U.S.C. § 1981. Therefore, there is no statutorily mandated cap on damages here because Saulsberry prevailed on her Title VII and 42 U.S.C. § 1981 retaliation claim.

4. Injunctive relief requiring SRR to implement training on document preservation for the purpose of complying with its duties under the law and training on retaliation and to implement and afford those workers who are eligible for the 3161 Preference in Hiring Benefit authorized by the National Defense Authorization Act for displaced Cold War Workers an actual preference in hiring and restrict SRR from terminating the benefit.

(ECF No. 136 at 1.)

SRR challenges Saulsberry's assertion that she is entitled to any pre-judgment interest on the back-pay award, but alternatively argues that if the court determines that Saulsberry is entitled to pre-judgment interest, then the court should, in its discretion, apply a lower interest rate. (ECF No. 139 at 8.) SRR argues that Saulsberry's request for an additional award to cover negative tax implications is improper because she "did not raise [the issue] during litigation" and further, a grant of an additional award would "violate the Seventh Amendment's prohibition against judicial re-examination of a jury's findings." (ECF No. 139 at 6.) Next, SRR argues that Saulsberry is not entitled to *any* front pay because (1) "reinstatement is a viable option" and (2) if awarded, Saulsberry's front pay award should be limited to four years as opposed to Saulsberry's request for an award for sixteen (16) years until 2035 (her projected retirement year). (ECF No. 139 at 12, 13.) Finally, SRR argues that the court does not have jurisdiction to grant Saulsberry's injunctive relief because the 3161 Preference in Hiring statute does not provide Saulsberry with a private right of action. (ECF No. 139 at 13.)

B.    The Court's Review

### 1. Pre-judgment Interest

Saulsberry asks the court to award her pre-judgment interest on the backpay award. Although SRR objects to an award of pre-judgment interest, SRR responds that if the court finds that an award of pre-judgment interest is appropriate in this case, the court should apply the post-judgment rate set forth by the "applicable rate of inflation" or a rate "set by this court." (*See* ECF

No. 139 at 8.) Therefore, the first issue is whether the court should grant any pre-judgment interest on Saulsberry's backpay award.

It is within this court's sound discretion to award pre-judgment interest on a plaintiff's back pay damages. *Maksymchuk v. Frank*, 987 F.2d 1072, 1075 (4th Cir. 1993). In *Loeffler v. Frank,* the Supreme Court noted that in Title VII suits, pre-judgment interest on back pay awards are "of course, [ ] an 'element of complete compensation.'" 486 U.S. 549, at 558 (1988) (citing *West Virginia v. United States,* 479 U.S. 305, 310 (1987)). Title VII authorizes interest awards as "a normal incident of suits against private parties." *Id.* While the Fourth Circuit has determined that denial of pre-judgment interest is appropriate where a plaintiff fails to raise the issue in a timely or appropriate manner, that is not the case here because Saulsberry requested pre-judgment interests in her complaint and prayer for relief. (*See* ECF No. 1 at 22.). The court, considering the goal of making Saulsberry whole, determines that pre-judgment interest is appropriate in this case. *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S. Ct. 2362, 2372 (1975) (The purpose of Title VII is "to fashion the most complete relief possible…to make the victims of unlawful discrimination whole..."); *see also Pecker v. Heckler*, 801 F.2d 709, 711 (4th Cir. 1986) ("We recently stated the standard to be applied by the courts of this circuit in determining what is an appropriate remedy under Title VII [and] "our objective is to place plaintiff in a position as near as possible to where she would be had discrimination not occurred." (citation omitted)). As one court stated, "a dollar tomorrow, unless interest is added, does not equal a dollar today." *Pegues v. Mississippi State Emp. Serv*., 899 F.2d 1449, 1453 (5th Cir. 1990) ("Interest is compensation for the use of funds; it is not awarded as a penalty against a defendant…under Title VII interest is an item that 'should be included in back pay' to make a victim whole."); *see Clarke v. Frank*, 960

F.2d 1146, 1153–54 (2d Cir. 1992) ("[W]e have held that 'it is ordinarily an abuse of discretion **not to include pre-judgment interest in a back-pay** award...'"(emphasis added)).

The next issue is whether the court should apply a state or federal interest rate to the pre-judgment interest award. As a threshold matter, there is currently no federally mandated pre-judgment interest rate for judgments awarded. However, the interest rate prescribed for post-judgment interest under federal law has been held to, in certain circumstances, be appropriate for fixing the rate of pre-judgment interest.[2] Nonetheless, in the absence of a statutory mandate, "the rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court." *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1031 (4th Cir. 1993) (en banc). "In determining the rate of pre-judgment interest, the district court is not bound by state law. That does not mean, however, that the district court may not in its discretion choose to apply the interest rate provided for by state law." *EEOC v. Liggett & Myers Inc.,* 690 F.2d 1072, 1074 (4th Cir. 1982). Further, while the Fourth Circuit has held that the determination of the rate of pre-judgment interest is generally a matter within the discretion of the trial court, when exercising that discretion, however, the court is guided by the purpose of pre-judgment interest, which is to "ensure that the [plaintiff] is placed in as good a position as she would have been" had Defendant not violated her rights. *Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co,* Inc., 226 F. Supp. 3d 520, 536 (W.D.N.C. 2016) (quoting *Devex*, 461 U.S. at 655, 103 S. Ct. 2058). The court is also tasked with considering "the prevention of unjust enrichment on behalf of [either party], the lost interest value of money wrongly withheld, and the rate of inflation."

---

[2] The district courts are not invariably compelled to adopt the statutory post-judgment rate in determining the rate of pre-judgment interest, but have discretion in the amount of such an award, guided by principles of reasonableness and fairness, by relevant state law, and by the interest rate prescribed by the statute for post-judgment interest. *44B Am. Jur. 2d Interest and Usury § 40.*

*Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 685-87 (6th Cir. 2013).

Here, Saulsberry urges the court to use the South Carolina state statutory rate for pre-judgment interest of 8.75%, compounded annually, which yields, according to Saulsberry's uncontested calculations, a pre-judgment interest amount of $55,118.00. On the other hand, SRR contends that the court should apply a lower interest rate, but does not specify a precise numerical value.

Upon careful consideration, the court concludes that the South Carolina statutory rate of 8.75% is an appropriate rate given the circumstances of this case and would not provide either party with a windfall or unjust enrichment. Further, Title VII is silent on the proper rate of pre-judgment interest and, "when a federal statute is silent on a particular matter, the federal courts often incorporate state law as the federal rule of decision." *Ford v. Uniroyal Pension Plan*, 154 F.3d. 613, 616 (6th Cir. 1998). Moreover, the state rate has been applied to Title VII in other situations in this Circuit. *See Miller v. HSBC Fin. Corp.*, No. 3:08-CV-01942-MJP, 2010 WL 2765485, at *1 (D.S.C. July 9, 2010) (court utilizing the South Carolina state pre-judgment interest rate in Title VII action). Therefore, the court **GRANTS** Saulsberry's request of $55,118.00 in pre-judgment interest at the state statutory rate.

### 2. Negative Tax Implications

Saulsberry also seeks a tax component award of $203,113 to avoid the negative tax consequences of receiving a lump-sum backpay award. Occasionally, receiving a lump sum backpay award may cause a plaintiff to enter a higher tax bracket, and thus, the plaintiff will have a larger tax liability than usual. *See Eshelman v. Agere Sys.*, 554 F.3d 426 (3rd Cir. 2009). Under the broad equitable powers provided to courts under Title VII and other statutes, courts have

discretion to include an additional sum of money to offset those negative tax consequences in appropriate cases. *Eshelman*, 554 F.3d at 441-42; *Sears v. Atchison, Topeka & Santa Fe Ry. Co.*, 749 F.2d 1451, 1456-57 (10th Cir. 1984); *O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 446 (E.D. Pa. 2000); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1380 (S.D. Fla. 1998) ("[A] district court, in the exercise of its discretion, may include a tax component in a lump sum backpay award to compensate prevailing Title VII plaintiffs."). However, the few courts which have granted a tax component award have done so sparingly. Indeed, although the Third Circuit has allowed a tax consequence award, it was quick to limit its *Eshleman* holding, stating that its opinion "d[id] not suggest that a prevailing plaintiff in discrimination cases is presumptively entitled to an additional award to offset tax consequences above the amount to which she would otherwise be entitled" and "[e]mployees. . .bear the burden to show the extent of the injury they have suffered." *Eshelman*, 554 F.3d at 443. Further, in *EEOC v. Northern Star Hospitality, Inc.*, the Seventh Circuit cautioned district courts to "show their work if they adjudge a similar tax component award. . ." 777 F.3d 898, 904 (7th Cir. 2015). Of course, the work necessarily flows from the guidance, if any, that a plaintiff has provided the court. In *Eshleman*, the court highlighted the dispositive fact the plaintiff provided the court with everything it needed to make its determination. There, the plaintiff submitted a sworn affidavit from a forensic economic expert—who, had testified at trial, articulated a precise calculation of the tax award, and articulated a clear methodology for the court to follow.

Here, the court finds that Saulsberry has not met her burden in demonstrating that she would face a negative tax implication, nor has she demonstrated that she is entitled to an additional award to offset any potential negative tax consequences. Indeed, courts have denied such an award request where, as here, plaintiffs failed to provide expert evidence and a clear and precise

calculation. *See Anderson v. Consol. Rail Corp.*, 2000 WL 1622863 (E.D. Pa. 2000); *see also Shovlin v. Timemed Labeling Sys., Inc.,* No. 95-CV-4808, 1997 WL 102523, at *3 (E.D. Pa. Feb. 28, 1997).

Saulsberry submitted a statement by CPA Sanford Loyd, which states:

> The federal tax brackets range from 10% to 37%. Per Mrs. Saulsberry's 2018 married filing joint tax return, the tax rate for the lump sum pay would be between 22% and 37%. Taxable Income over $612,350 is taxed at 37%. The tax consequences [*sic*] of the lump sum payment was calculated to be $203,113. See page 6."

Saulsberry also provided the court with a summary titled "Tax Implications." (see excerpt below)

TAX IMPLICATIONS
ADRIENNE SAULSBERRY
CASE # 1:16-cv-02792-JMC

| YEAR | WAGES DIFFERENCE | TAXES AT EFFECTIVE RATE FOR YEAR |
|---|---|---|
| 2019 | $475,118 | $203,113 |
| TOTALS | $475,118 | $203,113 |

ECF No. 139-8 at 6.

Additionally, Saulsberry submitted tax returns for the years of 2014, 2015, 2016, 2017, and 2018. While Saulsberry did provide the court with the mere sum total and tax records, the information provided does not aid the court in its determination of whether Saulsberry met her burden to "show the extent" of the negative tax implication. Besides the tax records, the court finds that she has not offered information about the formula or inputs used to arrive at what seems like an arbitrary $203,113 tax consequence. The court also notes that Saulsberry utilized one of the

highest tax rates in calculating the award. While information regarding her taxable income for 2019 was unavailable at the time of briefing, Saulsberry has not demonstrated that her most recent salary would exceed $612,350.00 to warrant usage of the highest rate. Further, Saulsberry fails to discuss the calculation and methodology breakdown in her brief and made no effort to clarify the calculations on reply after SRR categorized them as unclear. Moreover, there was no tax expert testimony calculating the "negative tax consequence" placed upon Saulsberry during the trial or otherwise. As such, this court is "not inclined to engage in the speculative task of determining the Plaintiff's future tax liability." *Shovlin,* No. 95-CV-4808, 1997 WL 102523, at *3. The court further observes that many of the cases on which Saulsberry relies for a tax component emphasized the importance of plaintiffs (a) presenting sworn testimony from an economic expert, usually one who had testified at trial or (b) establishing that an extenuating circumstance warrants the tax consequence award. *See e.g. Sears v. Atchison*, 749 F.2d at 1456 ("A tax component may not be appropriate in a typical Title VII case. . . But this case presents special circumstances in view of the protracted (**seventeen-years**) nature of the litigation.") (alteration in original) (emphasis added); *Roebuck*, 108 F. Supp. 2d at 447 (granting tax component award and noting that the main reason the court was able to grant was because the plaintiff "present[ed] the opinion and calculations of. . . the economic expert whose testimony the plaintiff presented at trial."). Finally, as the Fourth Circuit has noted in *Bryant v. Aiken Regional Medical Centers, Inc.,* although a trial court has broad equitable discretion in fashioning relief under the federal employment statutes, it is not an abuse of discretion to deny a tax consequence award request. 333 F. 536, 549 n.5 (4th Cir. 2003). Accordingly, the court **DENIES** Saulsberry's request for a $203,113 tax consequence award.

### 3. Reinstatement and Front Pay

Saulsberry has requested prospective equitable relief in the form of sixteen-years (16) of front pay (2019-2035). SRR contends that front pay is not an appropriate remedy because reinstatement is feasible. Before the court can order a front pay award, it must determine whether reinstatement, as the "preferred remedy", is appropriate. *See Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988) (stating that generally, reinstatement is the preferred remedy). Although reinstatement is usually the preferred remedy, reinstatement is not always required. The decision regarding reinstatement is within the sound discretion of the district court, and "several factors may persuade the district court after careful consideration in a particular case that the preferred remedy of reinstatement is not possible or is inappropriate." *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1330 (7th Cir. 1987).

### 3a. Reinstatement

Title VII and § 1981 look to place a plaintiff in the position she would have occupied but for the discriminatory conduct. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1422–23 (4th Cir. 1991); *Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 756-57 (M.D.N.C. 2016); *Squires v. Bonser*, 54 F.3d 168, 172 (3d Cir. 1995) ("Under Title VII, the statute's make-whole purpose 'is shown by the very fact that Congress took care to arm the courts with full equitable powers.' The same is true under § 1981.") Reinstatement and front pay provide ways for a court to achieve that goal by rectifying losses that will be realized from the time of judgment moving forward. *See Duke*, 928 F.2d at 1423–24; *Hunter*, 201 F. Supp. 3d at 756; *Squires*, 54 F.3d at 172–73.

In the Fourth Circuit, reinstatement is generally the preferred remedy over front pay because it eliminates some of the speculation that is necessary in crafting a front pay award. *Duke*, 928 F.2d at 1424. However, reinstatement is not always the best remedy. *Id*. For example, courts

have held reinstatement to be inappropriate when the litigation of the matter irreparably damaged the relationship between the parties. *Whittlesey v. Union Carbide Corp*., 742 F.2d 724, 728 (2d Cir. 1984). The Fourth Circuit has also disfavored reinstatement in certain circumstances where "intervening historical circumstances can make it [an] impossible or inappropriate [remedy]." *Duke*, 928 F.2d at 1422. The Fourth Circuit set forth the following examples of when reinstatement may not be proper. The list, while not exhaustive, provides some guidance here:

> [W]hen the employer has demonstrated 'such extreme hostility that, as a practical matter**, a productive and amicable working relationship would be impossible**.' Reinstatement has also been found inappropriate when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged; or when the company was no longer in business; or when the particular business for which the plaintiff was qualified was no longer operating; or when there was no comparable position available. Also, when the period for reinstatement was expected to be a relatively short one…

*Duke,* 928 F.2d at 1423 (emphasis added) (citations omitted).

For further consideration, the United States Court of Appeals for the Fifth Circuit has approved as permissible consideration of factors such as "discord and antagonism" between the parties, the availability of positions, the displacement of innocent employees, a plaintiff's success in securing other similar employment, and the need for certainty and predictability in personnel decisions in determining whether to award reinstatement. *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1254-55 (5th Cir. 1995). Finally, the United States Court of Appeals for the Seventh Circuit found that a district court had not abused its discretion in refusing to award reinstatement after considering factors such as the plaintiff's demand for a different job and relocation to a new city, the plaintiff's change in career goals since the unlawful employment action, no evidence of an open position, and the "acrimonious" relationship between the parties. *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1370-71 (7th Cir. 1992).

One district court has, in the course of ruling on a proposed award for front pay, collected and summarized the various factors that other Courts of Appeals, including the aforementioned, have identified as significant in the reinstatement analysis. Those factors include:

1) whether the employer is still in business, *Duke,* 928 F.2d at 1423;

(2) whether there is a comparable position available for the plaintiff to assume, *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993); *Duke,* 928 F.2d at 1423;

(3) whether an innocent employee would be displaced by reinstatement, *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *McKnight,* 973 F.2d at 1370–71;

(4) whether the parties agree that reinstatement is a viable remedy, *Ray,* 51 F.3d at 1254; *Roush,*   10 F.3d at 398;

(5) whether the degree of hostility or animosity between the parties—caused not only by the underlying offense but also by the litigation process—would undermine reinstatement, *Cowan v. Strafford R-VI Sch. Dist.*, 140 F.3d 1153, 1160 (8th Cir. 1998); *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir. 1993); *McKnight,* 973 F.2d at 1370–71; *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1280 (11th Cir. 1992); *Duke,* 928 F.2d at 1423;

(6) whether reinstatement would arouse hostility in the workplace, *Cowan,* 140 F.3d at 1160; *Ray,* 51 F.3d at 1254; *Roush,* 10 F.3d at 398; *Standley,* 5 F.3d at 322; *McKnight,* 973 F.2d at 1370–71; *Lewis,* 953 F.2d at 1280; *Duke,* 928 F.2d at 1423;

(7) whether the plaintiff has since acquired similar work, *Roush,* 10 F.3d at 398;

(8) whether the plaintiff's career goals have changed since the unlawful termination, *McKnight,* 973 F.2d at 1370–71; and

(9) whether the plaintiff has the ability to return to work for the defendant employer—including consideration of the effect of the dismissal on the plaintiff's self-worth. *Newhouse v. McCormick & Co.*, 110 F.3d 635, 641 (8th Cir. 1997); *Lewis,* 953 F.2d at 1280.

*Ogden v. Wax Works, Inc*., 29 F. Supp. 2d 1003, 1010 (N.D. Iowa 1998).

Examining the above factors, the court observes that some factors are more helpful in this analysis than others. As for factor (1) "whether the employee is still in business", factor (3)

"whether an innocent employee would be displaced", and factor (4) "whether the parties agree that reinstatement is a viable remedy", the court has reviewed the record established and finds that these factors add little, if anything, to the analysis. This is largely because there is no evidence to support them as relevant considerations. There was no evidence regarding the impact that Saulsberry's reinstatement would have on current SRR employees. Obviously, the parties disagree as to whether reinstatement is a viable remedy because that issue forms the basis of the dispute. As such, factor (4) is likewise, unhelpful. The court, therefore, focuses primarily on factors (5), (6), (7), (8) and (9) as these are the most pertinent to the court's analysis. Based on the pertinent factors, among other considerations, the court finds that reinstatement is impractical.

### Factor (5) Hostility between the Parties and; (6) Whether Reinstatement would Arouse Hostility

Factor (5) concerns the "level of hostility" caused by the underlying events as well as the present litigation and, factor (6) regards "whether reinstatement would arouse hostility". *See Cowan*, 140 F.3d at 1160; *Ray*, 51 F.3d at 1254; *Roush*, 10 F.3d at 398; *Standley*, 5 F.3d at 322; *Duke*, 928 F.2d at 1423. In affirming a front pay award, the Third Circuit has explained that the choice of such a remedy in lieu of an order that the plaintiff be reinstated rests in the sound discretion of the trial court. *Dillon v. Coles,* 746 F.2d 998 (3d Cir. 1984). Quoting the trial court, the *Goss* court explained:

> I do not believe that either plaintiff or defendant would seriously contend that it would be sensible to order plaintiff reinstated to a job in which harmonious working relationships are so important after the acrimony this case has engendered, nor could I possibly draft an injunctive order that would effectively make the existing ill feelings disappear. I will therefore consider plaintiff's front pay claim.

*Goss v. Exxon Office Sys. Co*., 747 F.2d 885, 890 (3d Cir. 1984).

Here, there can be no question that the events underlying Saulsberry's claims of retaliation have, before, during, and after litigation, resulted in a substantial degree of hostility between the

parties. First, Saulsberry's affidavit and testimony evidences significant despair in returning to a work environment where her colleagues and supervisors may continue to hold her in such poor regard. While the court agrees with SRR that several management personnel no longer work at the site, SRR's Vice President, Jim Wilson, continues to hold significant decision-making authority. Further, in addition to the underlying litigation, testimony revealed that in 2015 Saulsberry filed a complaint against SRR with the National Labor Relations Board and, ultimately, the Department of Energy—the fact that the parties have been engaged in other litigation is likewise unconducive to a "productive and amicable" relationship. Moreover, Saulsberry contends that the inclusion of information covering the underlying litigation and the public disclosure of the verdict in the local newspaper would create further tension in the workplace. Finally, the two individuals who were hired in 2014 and 2015, despite having inferior credentials to Saulsberry, are still employed with SRR. Although the litigation did not include these individuals, the court certainly recognizes how these circumstances would contribute to "lingering animosity and tensions in a working environment", which "reasonably supports an award of front pay in lieu of reinstatement." *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1553 (10th Cir. 1988). Considering SRR's demonstrated issues with Saulsberry, Saulsberry's tarnished relationship with her former supervisor Jim Wilson and his continued employment as Vice President, and the public disclosure of the underlying litigation, this court seriously doubts that Saulsberry could have a productive relationship with SRR moving forward. Both factors (5) and (6) weigh against reinstatement because ordering reinstatement would undermine the goals of providing both parties with positive relations in this close energy-scientific related community.

***(7) whether the plaintiff has since acquired similar work and (8) whether the
plaintiff's career goals have changed since the unlawful termination***

Factor (7) concerns "whether the plaintiff has since acquired work", and factor (8) concerns "whether the plaintiff's career goals have changed." Here, Saulsberry's career goals have changed. During her time away from SRR, Saulsberry decided to re-establish herself in an entirely different career. To that end, Saulsberry did more than merely express a desire to return to school, but she took concrete steps towards obtaining future employment by completing her bachelors and master's degrees in education curriculum and instruction—such efforts included new financial investments. The court here, as the court in *McKnight*, is hard-pressed to understand how Title VII's purposes would be served by placing Saulsberry in a job "[s]he does not want." *McKnight,* 973 F.2d 1370-71. While the court understands and recognizes that SRR "is not required to subsidize [her] new career through a lifetime front pay award", the court observes that district courts are to exercise discretion in selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded "for a reasonable future period required for the victim to re-establish her rightful place in the job market." *Goss,* 747 F.2d at 889–90. That Saulsberry secured several jobs and was continually employed until the date of trial establishes that Saulsberry attempted to mitigate her damages in a reasonable manner. Weighing all evidence, relevant factors, and considering Title VII's remedial purpose, the court **FINDS** that reinstatement is impractical.

### 3b. Front Pay Award

Having determined that reinstatement is impractical, the court now focuses on the amount of Saulsberry's front pay award. In Title VII cases, front pay is an alternative to the traditional equitable remedy of reinstatement. *See White v. Carolina Paperboard Corp.,* 564 F.2d 1073, 1091

(4th Cir. 1977); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 949-50 (10th Cir. 1979).

Saulsberry contends that she is entitled to a front pay award of $642,384 based on a projected retirement over the next sixteen (16) years. SRR counters by arguing that reinstatement and front pay is inappropriate because SRR offered Saulsberry an unconditional offer of employment in May of 2019, nearly six years post-termination and three years into this litigation.

Trial testimony also revealed that SRR offered Saulsberry an employment opportunity in 2015, which was contingent on Saulsberry's agreement to end the litigation. However, such an unconditional offer is not a bar to front pay recovery. SRR offered Saulsberry employment again in May 2019 and she rejected the offer. While SRR is correct that "ordinarily, a plaintiff's rejection of an unconditional offer forecloses a claim for front pay", it is also true that "refusal of reinstatement does not necessarily preclude the award of front pay if a plaintiff has reasonably refused the offer." *Blasic v. Chugach Support Services, Inc*. 673 F. Supp. 2d 389, 403 (2009). Reasonableness is "determined from the totality of the circumstances." *Id*. citing *Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir. 1994). Factors showing a reasonable refusal include: (1) a long time between termination and reinstatement; (2) refusal to expunge the employee's poor performance record; (3) continuing employment of the individuals responsible for the discrimination; (4) the employer's bad faith and overzealous attacks on plaintiff's job performance, and (5) suspicious timing of the employer's offer. *Id*. citing *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 755-56 (D. Md. 2001).

Here, Saulsberry reasonably rejected the 2019 offer for reinstatement. First, an objectively "long time" had lapsed between the date Saulsberry was terminated and the date of the offer. Indeed, SRR offered to reinstate Saulsberry nearly six years after her termination and after SRR

was aware of the various claims that Saulsberry brought against it. *But See Blasic*, 673 F. 389 at 403 (court finding that plaintiff's rejection of offer was unreasonable because the employer's attempt to reinstate came after only two months of the plaintiff's termination and before plaintiff filed EEOC complaint). Further, at the time of the offer, several of the managers who allegedly discriminated and/or retaliated against Saulsberry remained employed with SRR—including Cindy Head, Chuck Sanders, and Jim Wilson. Additionally, Saulsberry did not accept the offer for a First Line Manager position or other potential positions in 2019 because she was under contract with the South Carolina Board of Education and accepting the offer would place her teacher certification in jeopardy. Stopping short of, and without, determining whether the offer was made in good faith, the court finds that Saulsberry reaonsably refused the 2019 offer based on the totality of the circumstances presented. Accordingly, the court **FINDS** that Saulsberry is entitled to front pay.

### 3c. Front Pay Calculations

In calculating her front pay damages, Saulsberry estimates that she would have worked for SRR for the next 15 to 16 years. Saulsberry submits that her anticipated work life would be multiplied by the total of her estimated salary of $105,443.00. From this calculation, Saulsberry arrives at a figure of $642,384.00, which reflects her "Earnings if Continued with SRR" ($1,714,332) minus her "Mitigation Income" of $972,995 (her current salary of $59,877 multiplied by 16 minus present value difference). (ECF No. 136-8 at 4.) SRR, in opposition, states that Saulsberry's "mere assumption that she could expect continuous, uninterrupted future employment with SRR is unduly speculative" and the court, if awarding front pay, should limit her award to "four years." (ECF No. 139 at 14.)

In *Barbour v. Merrill,* 48 F.3d 1270, 1280 (D.C. Cir. 1995), the court identified the following factors to be considered to determine the amount to be awarded as front pay: (1) the plaintiff's age; (2) the reasonableness of the plaintiff's intention to continue employment with the employer; (3) the length of time persons in similar positions have stayed with the employer; (4) the plaintiff's efforts at mitigation of damages (including consideration of the current job market and the amount of time reasonably required for the plaintiff to secure comparable employment); and (5) the employer's proof as to the anticipated length of the plaintiff's employment.

Further, because a plaintiff's work and life expectancy are pertinent factors in calculating front pay, *Anastasio v. Schering Corp.,* 838 F.2d 701, 709 (3d Cir. 1988), such an award "necessarily implicates a prediction about the future." *Dillon,* 746 F.2d at 1006. Accordingly, the court will not refuse to award front pay merely because some prediction is necessary. *Green v. USX Corp.,* 843 F.2d 1511, 1532 (3d Cir. 1988), *vacated on other grounds,* 490 U.S. 1103, 109 S. Ct. 3151, 104 L.Ed.2d 1015 (1989), *reinstated in relevant part,* 896 F.2d 801, 801 (3d Cir. 1990). Instead, district courts are to exercise discretion in selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded "for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss,* 747 F.2d at 889–90. Even so, the Fourth Circuit has cautioned, however, that the district courts "must 'temper' the use of front pay by recognizing 'the potential windfall' to the plaintiff." *Dotson v. Pfizer, Inc.,* 558 F.3d 284, 300 (4th Cir. 2009) (quoting *Duke,* 928 F.2d at 1424)). Finally, "there is no bright line test for awarding front pay." *Hunter,* 201 F. Supp. 3d at 754; *see also Duke,* 928 F.2d at 1424 (recognizing that due to "[t]he infinite variety of factual circumstances that can be anticipated[,] ... front pay [is not] susceptible to legal standards for awarding damages."). Notwithstanding the

absence of a bright-line test, the court considers the aforementioned non-exclusive factors routinely considered by other courts.

Here, while the court agrees that some level of front pay is necessary, sixteen (16) years of front pay is not required to make Saulsberry whole. Saulsberry claims that, at age 49, she will not be able to obtain comparable employment and, thus, her front pay period should end at her anticipated retirement age of 65. While the court recognizes that Saulsberry was engaged in the type of highly specialized work to which the universe of available comparable positions is decidedly smaller than most occupations, the court also observes that her excellent credentials and strong work ethic presumes that Saulsberry could attain and prosper in suitable employment before she reaches her anticipated retirement age of 65. Still, the court notes that her advanced age (nearing fifty) may limit the available offers of comparable employment, thereby extending her employment search beyond average time frames. Considering Saulsberry's level of professional expertise, her age, and the results of her current job search, the court concludes that six years represents sufficient time for Saulsberry to obtain comparable employment or "retraining ... if that course is the one more suited to making ... her whole." *Duke,* 928 F.2d at 1424 ("front pay may serve as a substitute **or a complement**…") (emphasis added).

The court, in fashioning the remedy, observes that Saulsberry's estimated calculation of future earnings at SRR between 2019 and 2024 is $554,455. The court subtracts that total from her current salary for the same timeframe ($314,348) and comes to a total of $240,107. (*See* ECF No. 136-8 at 4.) Accordingly, the court **GRANTS** Saulsberry's request for a front pay award, but limits the award to six years of pay or $240,107.

### 4. *Injunctive Relief*

Finally, Saulsberry seeks an order from the court "requiring SRR to implement policies which ensure that employees are not retaliated against for engaging in protected activity in any of its forms to include but not limited to participating in work investigations and utilizing SRR's EEO internal process." (ECF No. 136 at 15.) Saulsberry further requests an order "reminding SRR of its duty to preserve and not lose documents that may be relevant when there is the anticipation of litigation such as an internal EEO complaint." (*Id.*) Saulsberry's final request is for the court to order SRR "to implement and afford those workers who are eligible for the 3161 Preference in Hiring Benefit authorized by the National Defense Authorization Act for displaced Cold War Workers an actual preference in hiring and restrict SRR from terminating the benefit." (136 at 15.)

The court has carefully considered Saulsberry's request, but concludes that injunctive relief is not warranted under the circumstances of this case. The court agrees that under Title VII, if the court finds that an employer has "intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the [employer] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e–5(g)(1). Accordingly, "[o]nce a violation of Title VII has been established, the district court has broad, albeit not unlimited, power **to fashion the relief it believes appropriate**." *Bridgeport Guardians Inc. v. City of Bridgeport,* 933 F.2d 1140, 1149 (2d Cir. 1991) (emphasis added).

Nonetheless, the court, in the exercise of its discretion, finds that Saulsberry is not entitled to injunctive relief because she is no longer employed with SRR. *See Cooper v. Ambassador Personnel, Inc.*, 570 F. Supp. 2d 1355, 1359-1360 (citing *Wallace v. Dunn Const. Co., Inc.*, 62 F.3d 374, 380 (11th Cir. 1995) (finding that, in a case under 29 U.S.C. § 2(d)(1), injunctive relief

was inappropriate because plaintiff was no longer employed by the defendant); *see also McCaskill v. ConAgra Foods, Inc.*, 296 F. Supp. 2d 1311, 1321 (M.D. Ala. 2003) (injunctive relief is unavailable as a remedy for a Title VII violation when the plaintiff is no longer employed by the defendant); *see also Caselman v. Pier 1 Imports (U.S.), Inc.*, No. 14-CV-02383-LHK, 2015 WL 106063, at *4 (N.D. Cal. Jan. 7, 2015) ("Plaintiff's individual claim for injunctive relief is moot because she no longer works for [defendant].") The reasoning lies within the bedrock underpinning of what creates an actual case or controversy rather than an advisory opinion—the "settling of some dispute which **affects the behavior of the defendant towards the plaintiff**." *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S. Ct. 2672 (1987) (emphasis in original). Here, Saulsberry will not be reinstated and, therefore, would no longer work with the individuals who retaliated against her. *See Reiter v. Metro. Transp. Auth. of New York*, 01-cv-2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (denying request for permanent injunction to prevent future retaliation under Title VII where the individual responsible was no longer plaintiff's supervisor and "there [was] no showing that [the new supervisor] would retaliate against the plaintiff in any way").

In reviewing requests for injunctive relief to implement specific anti-discrimination policies similar to ones presented here, the Court of Appeals for the Third Circuit in *Cardenas v. Massey,* 269 F.3d 251 (3d Cir. 2001), instructed that the injunctive relief requested could not make the plaintiff whole or be of an aid to him because he was no longer employed by that employer. In other words, the plaintiff could not be affected by the implementation of or failure to implement new policies. In a footnote, the court commented:

> To the extent he seeks relief for perceived ongoing discrimination at the AOC against current employees, he has presented no evidence of such discrimination and cannot in any case assert the rights of the employees.

*Cardenas,* 269 F.3d at 265 n. 9.

Similarly, in the instant case, Saulsberry's request for injunctive relief, while laudable, cannot protect any of Saulsberry's own continuing rights, but instead is designed to protect other employees by an admonition to SRR that it is not to violate the law. No evidence of any ongoing retaliation against current employees, however, was presented at trial. Since Saulsberry no longer works for SRR, such an injunction would be difficult to enforce. A request for sanctions or enforcement would need to be brought in the future by some unknown employee who would have standing, because Saulsberry lacks standing to enforce the rights of a third party. *See Cardenas,* 269 F.3d at 265 n. 9; *see also In re Diet Drugs Prods. Liab. Litig.,* 369 F.3d 293, 315 (3d Cir. 2004) (injunctions must be enforceable, workable, and capable of court supervision). Accordingly, the court **DENIES** Saulsberry's request for injunctive relief.

## IV. CONCLUSION

For the foregoing reasons, the court **GRANTS IN PART AND DENIES IN PART** Saulsberry's Motion for Equitable Relief (ECF No. 136). Specifically, the court **GRANTS** Plaintiff Adrienne Saulsberry's Motion (ECF No. 136) as to pre-judgment interest and hereby **ORDERS** Defendant Savannah River Remediation, LLC to pay pre-judgment interest in the amount of $55,118.00 to Plaintiff Adrienne Saulsberry. Further the court **GRANTS IN PART AND DENIES IN PART** Plaintiff Adrienne Saulsberry's Motion (ECF No. 136) as to front pay and hereby **ORDERS** Defendant Savannah River Remediation, LLC to pay front pay in the amount of $240,107.00 to Plaintiff Adrienne Saulsberry.

Additionally, the court **DENIES** Plaintiff Adrienne Saulsberry's Motion (ECF No. 136) as to a tax component award, and **DENIES** Plaintiff Adrienne Saulsberry's Motion (ECF No. 136) as to injunctive relief. With these matters decided, final judgment shall be entered in favor of

Saulsberry. Defendant Savannah River Remediation, LLC is to satisfy all awards granted to Plaintiff Adrienne Saulsberry within sixty (60) days of this order.

**IT  IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

January 17, 2020
Columbia, South Carolina